677 F.Supp. 933 (1987)
Michael SHAKMAN, et al., Plaintiffs,
v.
DEMOCRATIC ORGANIZATION OF COOK COUNTY, et al., Defendants.
No. 69 C 2145.
United States District Court, N.D. Illinois, E.D.
December 16, 1987.
*934 D. Maria Majeske, Janice S. Loughlin, Steven R. Gilford, Chicago, Ill., for plaintiffs.
Judson H. Miner, Acting Corp. Counsel, City of Chicago by Jonathan P. Siner, Asst. Corp. Counsel, Chicago, Ill., for defendant City of Chicago.
Richard M. Daley, State's Atty. of Cook County by Randolph T. Kemmer, Asst. State's Atty., Greg A. Kinczewski, Chief Atty., Cook County Forest Preserve Dist., Chicago, Ill., for Cook County defendants.

ORDER
BUA, District Judge.
Before this court is plaintiffs' motion to establish an adjustment factor for attorneys' fees. For the reasons stated herein, plaintiffs' motion is granted in part and denied in part.

I. FACTS
This is a class action brought under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1985, challenging the patronage practices of the regular Democratic and Republican Party organizations in most of the Northern District of Illinois. Plaintiffs are independent candidates, voters and taxpayers. The defendants include various government officers at the state and local levels, local government entities, and local organizations and officials of the two major political parties. Plaintiffs' principal theory is that the use of state and local government patronage power to coerce political support for the regular Party organizations and their candidates by the use of political hiring, firing and promotion practices violates independents' rights to fair and equal participation in the electoral process.
This case has a long history in this court. A 1969 dismissal of this action by Judge Marovitz on the ground of lack of standing was reversed by the Seventh Circuit Court of Appeals in 1970. Shakman v. Democratic Org. of Cook County, 435 F.2d 267 (7th Cir.1970) ("Shakman I"). Following that reversal, plaintiffs entered into a consent decree with many of the Democratic and Republican defendants. In 1979, this court found that all defendants engaged in a conspiracy to deprive plaintiffs of their constitutional and civil rights to a free political and electoral process. Shakman v. Democratic Org. of Cook County, 481 F.Supp. 1315, 1342 (N.D.Ill.1979) ("Shakman II"). Recently, the Seventh Circuit reversed the political hiring portion of Shakman II deciding plaintiffs' asserted injuries lacked sufficient proximity to defendants' conduct to afford standing. Shakman v. Democratic Org. of Cook County, 481 F.Supp. 1315 (N.D.Ill.1979), rev'd in part 829 F.2d 1387, 1396-99 (7th Cir.1987) ("Shakman III"). The Seventh Circuit's most recent pronouncement in Shakman III, however, affected only a small number of defendants as a vast majority declined to appeal the 1979 order.[1]
This court's last order concerning this case dealt with plaintiffs' motions to calculate costs and attorneys' fees pursuant to *935 42 U.S.C. § 1988. Although arriving at a base amount or "lodestar" of $883,504.75 for attorneys' fees, this court specifically reserved ruling on what multiplier, if any, should be applied to compute reasonable attorneys' fees for the hours expended during pendency of this case. Shakman v. Democratic Org. of Cook County, 634 F.Supp. 895, 905 (N.D.Ill.1986) ("Shakman IV"). Plaintiffs now motion this court for determination of the multiplier issue.

II. DISCUSSION
Plaintiffs claim that the nature of this case and the results achieved are so extraordinary that an upward adjustment of the lodestar is appropriate and necessary to arrive at a reasonable attorneys' fee under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (the "Awards Act"). According to plaintiffs, a multiplier is necessary to compensate counsel for delay in payment, exceptional efficiency, lost opportunities, successful results, and risk of nonpayment.[2]
Defendants argue, however, that any adjustment to the lodestar for the reasons stated by plaintiffs is impermissible in light of this court's earlier order in Shakman IV and the Supreme Court's rulings in Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("Delaware Valley I"), and Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, ___ U.S. ___, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ("Delaware Valley II"). Defendants first argue that this court has already compensated plaintiffs for delay in payment by choosing to compute the lodestar based on the current hourly rate charged by plaintiffs' counsel. See Shakman IV, 634 F.Supp. at 902-03. Defendants also take the position that Delaware Valley I effectively precludes any adjustment for the factors of exceptional efficiency, successful results and lost opportunities, as these factors are presumably addressed when the lodestar is computed by multiplying hours reasonably spent by a reasonable hourly rate. Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3098-3099. Finally, defendants assert that the clear import of Delaware Valley II is that adjustments for risk of loss are no longer permissible.[3]Delaware Valley II, 478 U.S. at ___, 107 S.Ct. at 3087. Because of the impact which the Supreme Court's rulings in Delaware Valley I and II have on the issue before this court, a detailed review of Delaware Valley I and II will be undertaken before proceeding to the arguments presented by the parties.

A. Delaware Valley I

The Delaware Valley litigation arose in the context of an action asserted by a citizens' council and others against the Commonwealth *936 of Pennsylvania to compel compliance with a vehicle emission inspection and maintenance program mandated by provisions of the Clean Air Act, 42 U.S.C. § 7401 et seq. After prevailing on the merits in the district court, the citizens' council petitioned for an award of costs and attorneys' fees pursuant to § 304(d) of the Clean Air Act which provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party whenever the court determines such an award is appropriate." 42 U.S.C. § 7604(d).
Granting the request for fees, the district court first segregated the attorney's work on the case into nine distinct phases and then scrutinized the number of hours claimed by each attorney. Delaware Valley Citizens' Council for Clean Air v. Pennsylvania, 581 F.Supp. 1412, 1420-31. Citing reasons such as insufficient documentation, duplication of effort and inefficient use of time, the court reduced the total number of hours claimed by almost one third. Id. After further dividing the time claimed into three subclasses depending on the district court's perception of the relative complexity of the work completed, the district court multiplied the hours allowed by one of three hourly rates and arrived at lodestar figures for each of the nine phases. Id.
Next, the district court addressed the issue of whether the risk of nonpayment assumed, quality of work performed and results obtained by the council's attorneys necessitated a multiplier be assigned to award a "reasonable attorney's fee." Id. at 1431. The district court stated that new and novel issues were raised and resolved by the suit with little or no precedent. Id. The district court also emphasized that "the contingent nature of plaintiff's success [had] been apparent throughout [the] litigation." Id. Relying on the foregoing statements, the district court assigned a multiplier of two to those phases of the litigation where the likelihood of success appeared most removed. Id. The court then commented on the superior quality of legal work performed on behalf of the citizens' council during one phase of the litigation. Id. Finding an increase premised on the quality of work performed and the successful results obtained "fully justified," the court awarded an additional multiplier of two to one of the phases that had already been assigned a multiplier for risk of nonpayment. Id. The district court's award of multipliers was affirmed by the Court of Appeals, and the Supreme Court granted certiorari.
Reviewing the decision to award plaintiff's attorneys a fee enhancement, the Supreme Court first turned to the language of the section in the Clean Air Act providing for attorney's fees. Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3095. Noting that § 304 of the Clean Air Act and § 1988 of the Awards Act, 42 U.S.C. § 1988, possessed similar language and a common legislative purpose, the Court concluded both provisions were to be interpreted in the same manner. Id. at ___, 106 S.Ct. at 3096. With this preface, the Court began a detailed review of prior decisions addressing methods for calculating reasonable attorneys' fees for prevailing parties under fee shifting statutes.
The Court first examined the approach taken in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), in which a list of twelve factors taken from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980) was used to ascertain a reasonable attorney's fee.[4]Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3097. Although recognizing that Johnson was cited with approval by Congress *937 when § 1988 was enacted, the Court was critical of the approach suggested in that case because of the likelihood that the rather subjective criteria presented to trial judges to set attorneys' fees would result in disparate awards. Id.
A second method for calculating attorneys' fees known as the "lodestar" approach was then analyzed. Id. Developed by the Third Circuit, the first step in the lodestar approach is to multiply the hours spent on the case by a reasonable hourly rate for each attorney. Id. (citing Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir.1976)). Once arriving at the lodestar figure, adjustments could be made for the risk of nonpayment and the quality of work performed as evidenced by the complexity of issues, work observed, and results obtained. Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3097. Though deeming the lodestar approach a preferable method for arriving at a reasonable fee, the Court emphasized that enhancements for the risk of nonpayment and the quality of an attorney's work still posed a threat of inconsistent fee awards. Id.
Next, the Court reviewed two of its earlier decisions concerning attorneys' fees under § 1988. Id. (citing Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed. 2d 40 (1983); and Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The Court noted that the approach adopted in Hensley was essentially a hybrid that shared aspects of both the Johnson and lodestar methods of calculation. Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3097. According to the Hensley decision "the starting point for determining the amount of reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. (quoting Hensley, 461 U.S. at 433, 103 S.Ct. at 1939). After arriving at this base figure, Hensley instructs that the factors listed in Johnson decision could be considered to adjust the fee upward or downward. Id. However, as underscored by the Court, Hensley cautions that many of the factors listed in Johnson are usually subsumed within the initial lodestar calculation. Id. at ___, 106 S.Ct. at 3098 (citing Hensley, 461 U.S. at 434, 103 S.Ct. at 1940).
In Blum v. Stenson, the first leg of the lodestar method was again adopted by the Court as the first step in calculating a reasonable attorney's fee. Delaware Valley I at ___, 106 S.Ct. at 3098 (citing Blum v. Stenson, 465 U.S. at 888, 104 S.Ct. at 1543-44). However, Blum emphasizes the lodestar figure (reasonable hours expended multiplied by a reasonable fee) should be presumed to be the reasonable fee to which counsel is entitled. Id. According to the Supreme Court, Blum specifically limits the consideration of many of the Johnson factors once believed available for enhancing the lodestar amount. Id. Quoting from Blum, the Delaware Valley Court observed that "novelty [and] complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award." Id. Although recognizing the strong presumption of reasonableness attached to the lodestar figure did not foreclose the application of multipliers in all cases, the Court emphasized Blum limited the use of fee enhancements to certain "rare" and "exceptional" situations where specific evidence was offered and detailed findings were made documenting the exceptional nature of the case. Id.
Completing its review of prior authority, the Supreme Court reemphasized that a strong presumption should attach that the lodestar figure represents a reasonable attorney fee. Id. In the Court's view, whenever an attorney agrees to represent a client, an obligation automatically arises to "perform to the best of his ability and to produce the best possible results." Id. Since the lodestar method of computing fees accounts for such factors by considering the reasonable number of hours expended and ascertaining a reasonable hourly rate, the Court concluded that "little room [exists] for enhancing the award *938 based on [counsel's] post-engagement performance." Id.
Turning to the facts in the case before it, the Court rejected the district court's finding that an upward adjustment for successful results and superior work was appropriate. First, the Court flatly stated the quality of an attorney's performance "ordinarily should not be used to adjust the lodestar." Id. at ___, 106 S.Ct. at 3099.
Next, the Court stated that insufficient evidence existed in the record to conclude that this was one of the "rare" cases in which an upward adjustment for extraordinary performance and successful results was permissible. Id. It was observed that in the phase where a multiplier for superior performance had been awarded, the district court eliminated a large number of claimed hours on the basis that they were "unnecessary, unreasonable or unproductive." Id. The Court also pointed out that substantial numbers of hours allowed in this phase were compensated at rates set by the district court for work which could have been performed by an associate or paralegal. Additionally, the Court noted that the citizens' council presented no specific evidence demonstrating why the results achieved in the enhanced phases were so extraordinary that a multiplier was necessary to adequately compensate counsel. Id. Finally, the Court commented that the district court failed to make any detailed findings identifying why the lodestar figure did not provide a reasonable fee and why the performance of counsel was not adequately represented by the product of hours reasonably spent times a reasonable hourly rate when compared to fee awards in other cases with equally outstanding performance. Id. at ___, 106 S.Ct. at 3100. As such, the Court reversed the district court's determination that an enhancement for the quality of representation and the results achieved was supported by the facts in the case.

B. Delaware Valley II

In Delaware Valley II, the Supreme Court addressed whether the district court erred in awarding a multiplier to compensate counsel for assuming the risk of loss and nonpayment. Although a sharply divided Court was unable to form a clear majority, the opinion of the four-member plurality taken together with the concurring opinion of Justice O'Connor provides some guidance.
The majority[5] began its analysis by observing that two considerations arise when an attorney agrees to accept a case with the understanding he will be compensated only if his client prevails. Delaware Valley II, ___ U.S. ___, 107 S.Ct. 3078, 3081-82, 97 L.Ed.2d 585 (1987). First, because substantial delay is often encountered between when the attorney expends his time and when, assuming he prevails, he receives his compensation, the Court believed the lodestar figure could be adjusted to account for the delay in payment. Id. In the Court's view, such adjustments were consistent with the purpose of typical fee shifting statutes. Id.
Certain difficulties, however, were perceived with awarding an adjustment for the second consideration in contingency cases: the risk of nonpayment.[6] The majority reiterated the observations of certain commentators and lower courts that awarding enhancements for risk of nonpayment "penalizes the defendant with the strongest defense and forces him to subsidize the plaintiff's attorney for bringing other unsuccessful actions against other defendants." Id. at ___, 107 S.Ct. at 3085. The Court also expressed concern over the difficulty faced by courts in retroactively estimating the plaintiff's likelihood of success from the perspective of the attorney when *939 he first considered filing the action. Id. Additionally, the Court considered the view of some commentators that "because the contingency bonus cannot be determined with either certainty or accuracy, it cannot be justified on the ground that it provides an appropriate incentive for litigation." Id. Nevertheless, the Court acknowledged that other commentators have argued that an enhancement for risk of loss is a necessary inducement for an attorney to accept a case on a contingent basis. Id. at ___, 107 S.Ct. at 3082. Moreover, the Court recognized that numerous Courts of Appeals have upheld upward adjustments of the lodestar to account for the risk of loss. Id. at ___, n. 4, 107 S.Ct. at 3082 n. 4.
Next, the Court examined whether Congress in adopting the fee shifting statutes intended to allow fee enhancements for assuming the risk of loss. At this point, however, Justice O'Connor departed from the views of the plurality. Although the plurality determined that the legislative history of the fee shifting statutes was at best inconclusive on this issue, Justice O'Connor, together with the four dissenting Justices, took the view that Congress did not intend to foreclose the consideration of contingency in computing a reasonable attorney's fee. Id. at ___, 107 S.Ct. at 3089 (O'Connor, J., concurring in part). Weighing the above-described arguments favoring and disfavoring the use of contingency multipliers, the plurality determined that the risk of losing a lawsuit could not provide an independent basis for enhancing an otherwise reasonable attorney's fee. Id. at ___, 107 S.Ct. at 3086. As such, the plurality concluded "that multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is [sic] impermissible under the usual fee shifting statutes." Id. at ___, 107 S.Ct. at 3087. However, due to Justice O'Connor's concurring opinion rejecting the proposition that contingency multipliers were forbidden under fee shifting statutes, the plurality was forced to continue its analysis.
Assuming that the fee shifting statutes could be interpreted to allow risk enhancements in exceptional cases, the plurality nevertheless determined the district court erred in awarding a contingency multiplier. Id. at ___, 107 S.Ct. at 3088. According to the plurality, little risk was assumed by the council attorneys in conducting phases of litigation where contingency multipliers had been assigned because such phases occurred after the parties entered into a consent decree. Id. at ___, 107 S.Ct. at 3089. Even if a substantial risk of not prevailing could have been demonstrated to the plurality's satisfaction, the multiplier of two assigned by the district court was deemed excessive. Id. In the plurality's view, when a district court properly finds a real risk of not prevailing, it may at most award a risk enhancement equal to one third of the lodestar. Any additional adjustment, the plurality cautioned "would require the most exacting justification." Id. Finally, the plurality instructed that before any adjustment for risk assumption could be made, "there should be evidence in the record, and the trial court should so find, that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." Id.
Justice O'Connor, although agreeing that the district court erred in awarding a risk multiplier, departed from the views of the plurality in certain respects. First, Justice O'Connor adopted the view of the four dissenting Justices that risk of loss, in appropriate cases, could be considered in computing reasonable attorneys' fees. Id. at ___, 107 S.Ct. at 3089 (O'Connor, J., concurring in part). Second, Justice O'Connor agreed with the dissenters "that compensation for contingency must be based on the difference in market treatment of contingent fee cases as a class, rather than on an assessment of the riskiness of any particular case." Id.
Nevertheless, Justice O'Connor sided with the plurality in holding that "novelty and difficulty of the issues presented, and ... potential for protracted litigation," are factors presumably reflected in the lodestar and cannot be utilized to justify a risk enhancement. Id. Concurring with the plurality, she reiterated that no risk enhancement *940 is awardable unless a plaintiff establishes that but for the promise of an enhanced fee, the plaintiff would have encountered great difficulty in securing competent counsel in the relevant legal market. Id. at ___, 107 S.Ct. at 3091 (O'Connor, J., concurring in part). Justice O'Connor instructed district courts to treat contingency cases as a class and determine how the market in the relevant legal community compensates for assuming the risk of loss. The burden of showing that the lodestar figure is insufficient to attract effective counsel, the Justice emphasized, falls on the party seeking the enhancement. Id. Unless a risk premium is necessary to attract competent counsel, Justice O'Connor opinioned that one should not be granted. Id. Because the district court based its enhancement on legal and other risks unique to the case and did not explore what level of additional compensation was necessary in the relevant market to attract competent counsel, Justice O'Connor determined the district court's multiplier award was improper. Id. As such, the district court's award of a multiplier for risk of nonpayment was reversed.

C. Delay in Payment

Plaintiffs first seek an upward adjustment to the lodestar for delay in payment. Essentially, plaintiffs argue that this court's decision in Shakman IV to calculate the lodestar using present hourly rates rather than historical rates with an adjustment fails to adequately compensate counsel for the delay in payment endured. According to plaintiffs, a substantial adjustment is necessary to approximate, in present value terms, payments at historical hourly rates. This additional adjustment, plaintiffs contend, is necessary to produce a reasonably compensatory fee.
Clearly, plaintiffs are entitled to an adjustment to offset inflation and the time value of money.[7] The Supreme Court in Delaware Valley II unequivocally stated that adjustments for delay in payment are consistent with the statutory purpose of awarding reasonable attorneys' fees to prevailing parties. Delaware Valley II, ___ U.S. at ___, 107 S.Ct. at 3081-82. Thus, the issue becomes whether the use of current hourly rates is sufficient to compensate plaintiffs' attorneys for inflation and the time value of money.
In Shakman IV this court considered parties' arguments only with regard to setting the lodestar or base amount, (i.e., hours reasonably spent times a reasonable hourly rate). Whether any upward adjustment to the lodestar would be awarded was reserved for determination at a later date. See Shakman IV, 634 F.Supp. at 905. Plaintiffs urged in Shakman IV that current rather than historical hourly rates be used as the first step in adjusting for inflation and the time value of money. Given that plaintiffs' counsel had not received any compensation for their work throughout the 17-year pendency of the Shakman litigation, this court computed the lodestar amount using current hourly rates to help compensate for the delay in payment.[8] Apparently, because *941 the question of multipliers was reserved for subsequent determination, plaintiffs did not ask for the additional enhancement necessary to approximate the present value of legal fees incurred. Whether an additional adjustment for delay is allowable and necessary is the first issue this court must address.
If one begins with the view that plaintiffs' counsel are entitled to a certain upward adjustment for inflation and the time value of money when a substantial delay in payment is experienced, whether that adjustment is awarded in one step or two is unimportant.[9] The critical issue is whether adjustment for these two factors accurately reflects what the attorneys would have realized had they been paid on a regular basis for their work. However, in making such adjustments, special care must be taken to avoid compensating for the same factors twice. See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 776 F.2d 646, 651 n. 3 (7th Cir.1985).
Plaintiffs submit calculations designed to reflect the present value of fees due their attorneys. After multiplying the hours deemed allowable in each month by the then current hourly rate, plaintiffs add an enhancement based on the cost of borrowing such funds from a financial institution. The borrowing rate used by plaintiffs is the prime rate existing at the end of each month fees were due plus ¾%. The proposed interest rate is said to approximate the borrowing rate for law firms with high credit ratings. This adjustment for inflation and the time value of money is urged by plaintiffs because such a rate most closely replicates the actual cost sustained by plaintiffs' counsel. Plaintiffs contend that since their counsel devoted substantial hours each month for which reasonably prompt payment was not forthcoming, their attorneys were forced to use or "borrow" capital to meet costs of practicing law. The most reasonable method of computing the cost of using capital during the period of delay, plaintiffs argue, is the borrowing cost their attorneys would have incurred had they actually secured loans for the fees due. Calculation of present value on any other basis, plaintiffs conclude, would not properly compensate counsel for the 17-year delay in payment experienced.
Defendants, however, point out certain defects in plaintiffs' method of computing present value. First, defendants note that according to plaintiffs' logic, an attorney at a law firm with an excellent credit rating that could borrow funds at ¾% over the prime rate could demand such an adjustment on delayed fee payments. Yet, an attorney at a law firm with a poor credit rating that could only borrow money at a cost of 3% or 4% over prime would be entitled to a greater adjustment for delay. Such a method of compensating for delay, defendants observe, leads to substantial and arbitrary differences in amounts received by attorneys based on the credit worthiness of their firm.
Second, defendants note that if one accepts the proposition that delay in payment necessitates an investment of capital by a plaintiff's attorney, the proper measure of present value is the rate at which the capital could have been safely invested. Defendants argue that since banks lend money at a rate greater than that offered to depositors to invest, compensating a plaintiff's attorney at the cost of borrowing funds rather than the rate he or she could expect to receive on a safe and reliable investment results in an unjustifiable windfall. Instead, defendants assert a more realistic method would involve the use of some rate lower than the prime to compute the present value of fees due.
This court agrees. From a policy perspective, adopting the approach advocated by plaintiffs would result in widely disparate adjustments depending on the credit-worthiness of the prevailing party's attorneys. *942 Additionally, this approach would involve a certain degree of speculation since a law firm's credit rating changes over time and attorneys may associate themselves with different firms during the pendency of the case. Collecting and verifying this credit information in many cases would be difficult and time consuming, if not impossible. Since time reasonably spent on fee petitions is compensable under § 1988, sanctioning such an approach would lead to substantial fee awards for work having little if anything to do with vindicating a plaintiff's civil rights.
Although plaintiffs assert that using the rate of return on conservative investments such as government securities does not sufficiently compensate plaintiffs' attorneys for their investment in plaintiffs' case, this argument is unpersuasive. Delaware Valley II teaches that delay in payment and risk of loss are distinct concepts for adjusting the lodestar and require separate analyses. As such, the riskiness of "investing" in plaintiffs' case cannot be considered when adjusting for inflation and the time value of money. Delaware Valley II, ___ U.S. at ___, 107 S.Ct. at 3081-82. Finally, this court doubts whether the method plaintiffs propose for compensating for delay is necessary to induce competent attorneys to accept cases covered by fee shifting statutes.
Since this court has already determined that the adjustment for delay in payment will be made for both inflation and the time value of money, an appropriate and objective basis for calculating this adjustment is the interest rate applicable to short term Treasury bills. Such an approach is consistent with the method adopted in 28 U.S. C. § 1961 for computing interest allowable on money judgments recovered in district courts and provides a reasonably accurate measure of inflation and the time value of money.
Using the average annual yield on three-month Treasury bills, this court computed the accumulated present value of historical fees due each of plaintiffs' attorneys as of November 30, 1987. See Appendices B-E.[10] Comparing the accumulated present value of fees for plaintiffs' attorneys to the lodestar amount derived in Shakman IV by using current hourly rates times hours reasonably spent, a mild adjustment for delay in payment is necessary. See Appendix A. Thus, this court awards an additional adjustment of 5.9% to the lodestar bringing the new base amount for the designated attorneys to $897,482. The additional fee enhancement is to be divided among plaintiffs' attorneys as indicated in Appendix A.

D. Exceptional Efficiency and Lost Opportunities

Plaintiffs next assert that the exceptional efficiency in which their attorneys handled this case resulted in an extraordinary low number of hours charged for the work completed and that an upward adjustment is required to adequately compensate counsel. Plaintiffs also argue that *943 their attorneys' 17-year involvement with this case caused them to forego other, more lucrative opportunities. Plaintiffs thus contend a fee enhancement for lost opportunities is appropriate in this case. These arguments will be addressed in turn.
With regard to exceptional efficiency, plaintiffs claim that in comparison with other large scale class action cases, the staffing of this case was extremely light and the number of hours billed for several projects extremely low. Additionally, the frequent practice of entering into stipulations and settlements with defendants is highlighted by plaintiffs to emphasize their attorneys' strategies in managing this case resulted in extraordinary economies by conserving chargeable time. Had the case progressed in a more adversarial mode, plaintiffs point out that a substantial number of hours would have been expended in discovery and trial preparation resulting in a significantly higher lodestar figure.
First, difficulty exists with attributing the savings resulting from the practice of stipulation and settlement exclusively to plaintiffs. Defendants correctly point out that they, at least as much as plaintiffs, are responsible for this practice and the resulting time savings. The record makes clear that both sides' willingness to resolve the issues in this case without a trial is the reason a substantial amount of attorney time was saved. As this court previously observed in Shakman II, "the parties, in an admirable spirit of conciliation, have endeavored to put this case in a position where the court could resolve it without the necessity of a public trial." Shakman II, 481 F.Supp. at 1355. To award a multiplier based on such a consideration would result in a penalty to the defendants for their cooperative efforts and is therefore inappropriate.
Examining plaintiffs' remaining justifications for an efficiency multiplier in light of the Supreme Court's pronouncements in Delaware Valley I indicates fee enhancement for such factors is improper. "[W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests." Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3098. In discharging his "obligation to perform to the best of his ability," an attorney is duty bound to spend his time efficiently and not devote more resources to a matter than are necessary "to produce the best possible results commensurate with ... his client's interests." Id. Efficiency in staffing a case and performing work is a consideration which is generally subsumed in the hourly rate awarded to compute the lodestar. To eliminate the danger of "double counting," it should not be used to justify an enhancement to the lodestar. Id. at ___, 106 S.Ct. at 3099. As such, this court denies plaintiffs' request for an efficiency multiplier.
In their argument concerning lost opportunities, plaintiffs first assert an upward adjustment to the lodestar is necessary to compensate plaintiffs' attorneys for the undesirable nature of the case which caused the alienation of potential clients who would have otherwise hired plaintiffs' attorneys. Plaintiffs also contend an enhancement is required because their attorneys' work on this case precluded them from accepting and developing engagements with clients possessing the need for future or repeated legal work. Since these attorneys normally charge clients who exhibit no potential for future employment a 10% to 15% premium above their normal hourly rate, a commensurate adjustment is asked for by plaintiffs to adequately compensate their attorneys.
A careful reading of affidavits submitted by plaintiffs' attorneys, however, reveals no actual evidence that any business opportunities were lost due to their involvement in this case. Indeed, the affidavit of plaintiffs' expert, Lowell Sachnoff, affirmatively states: "It is impossible to know with any certainty what clients or potential clients did not come to plaintiffs' counsel for legal representation because of their representation of plaintiffs in the Shakman case." Sachnoff Aff. II, ¶ 4, p. 10.
*944 Assuming consideration of this factor remains a viable basis for enhancing the lodestar after the Delaware Valley decisions, specific evidence must exist that the undesirability resulted in some damage to plaintiffs attorneys' practice. Here, no such evidence is presented. Quite to the contrary, counsel's involvement in the Shakman litigation has arguably enhanced their reputation in the legal community. Moreover, this court entertains little doubt that a primary motivation for counsel's representation of plaintiffs in this case was the opportunity to dismantle the long-standing patronage practices of Democratic and Republican Party organizations in the Northern District of Illinois. Although possibly undesirable for defendants, the nature of this case most likely supplied plaintiffs' counsel with the incentive to persevere. Thus, a fee enhancement for undesirability is inappropriate.
This court is also unable to agree with plaintiffs' contention that because counsels' representation in Shakman did not possess the potential for future business, a fee enhancement is necessary. As defendants note, counsel has been working on Shakman for more than 17 years. A longer attorney-client relationship is simply hard to imagine. Additionally, even if plaintiffs' attorneys normally charge a premium for conducting isolated litigation, such a consideration should have been articulated when the issue of reasonable hourly fees was addressed. As such, this court is unsympathetic to plaintiffs' request for upward adjustment based on limited nature of counsel's employ with the Shakman plaintiffs.

E. Successful Results

Plaintiffs argue that in light of the nature of this case and the successful results achieved, a substantial adjustment to the lodestar is necessary to produce a reasonably compensatory fee. Citing excerpts from the Supreme Court's opinions in Delaware Valley I, Blum, and Hensley, plaintiffs contend the law is clear that fee awards under § 1988 may be adjusted to reflect the results obtained. Although recognizing that the Supreme Court's most recent pronouncements in Delaware Valley I and Blum limit adjustments for successful results to only "rare and exceptional cases," plaintiffs assert the successful results of this case are sufficiently extraordinary to warrant an upward adjustment to the lodestar.
No doubt exists the Supreme Court in Delaware Valley I sought to discourage district courts from awarding enhancements for successful results, emphasizing that the product of reasonable hours times a reasonable hourly rate will presumably compensate counsel in full for their services. The Court instructed that considerations such as quality of representation and results obtained "ordinarily should not be used to adjust the lodestar, thus removing any danger of double counting." Delaware Valley I, at ___, 106 S.Ct. at 3098-99. In fact, as the defendants note, the Seventh Circuit has recently observed that the Supreme Court's position in Delaware Valley I leaves little doubt that enhancements for exceptional success are disfavored. In re Burlington Northern, Inc. Employment Practices Litigation, 803 F.2d 279, 285 (7th Cir.1986).
Yet, it is equally clear that the Court did not intend to preclude upward adjustments for successful results in all cases. Success multipliers, the Court stated, "are still permissible," ... but "proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts." Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3098 (citing Blum, 465 U.S. at 898-901, 104 S.Ct. at 1548-50).
Considering the submissions presented by plaintiffs in support of a success multiplier and the insights derived by this court's extensive involvement with this case, this court is convinced that the standards set forth by the Supreme Court for a success enhancement are met. Simply put, in the twenty-four years during which I have served as a judge, I have never presided over a case with greater significance or more widefelt impact in the area of civil rights than Shakman. Prior to the filing of this action, the defendants and their *945 political organizations used coercion in the form of threats of nonemployment, demotion or termination to gather substantial if not decisive political support for themselves and their organizations' candidates. As noted by certain defendants in prior submissions:
As a direct result of [Shakman] and Elrod v. Burns, patronage precinct workers in Cook County have now fragmented into free agents, able to work voluntarily and freely for any candidate they wish, not just those slated by the regular Democrats. Thus, independent candidates now have an indisputably equal chance at carrying the city of Chicago and suburban Cook County and their supporters have an equally effective voice in determining election results.
Brief for Defendants  Appellants Dunne, Hynes, Kusper and Forest Preserve of Cook County, dated October 4, 1985, at 50-51.
The success achieved in Shakman now ensures that the electoral process in Illinois will no longer be subjected to the misuse of governmental power over public employees and job applicants that once served to tip the electoral scale in favor of the incumbent political group. As previously noted by this court in Shakman II, resolution of the substantive claims asserted by plaintiffs could not be accomplished by a mechanical application of prior case law. Shakman II, 481 F.Supp. at 1327-28. Imagination and creativity on the part of plaintiffs' counsel were necessary to fashion arguments persuasive enough to invoke judicial protection of constitutional rights which previously had not been clearly recognized by the courts. Shakman has enhanced the ability of independent candidates to run for office and of voters to associate freely and express their opinions regarding the candidates. This case has resulted in the application of fundamental constitutional principles to protect the basic functioning of the democratic system in the Northern District of Illinois. This court agrees with plaintiffs assessment that no higher value can be ascribed to any result than the protection of a fundamentally fair electoral process.
Shakman has also resulted in freeing tens of thousands of public employees and countless job applicants from coercion with regard to political support, campaign work and financial contributions. The relief obtained by plaintiffs affects over 70,000 governmental employees. This litigation has given rise to a new class of equitable actions in the Northern District of Illinois known as Shakman petitions. Through this judicial procedure, individuals claiming violation of Shakman judgments or decrees are provided with a federal forum for protecting their constitutional rights to be free from political coercion in public employment. During the course of this court's supervision of this case, hundreds of petitions were filed claiming noncompliance with the Shakman decrees and judgments. Hearings on these petitions were routinely conducted by this court shortly after the actions were initiated and in a substantial number of instances, resulted in an order of relief for the petitioner.
Aside from its enormous political and social impact, the results in this case have had a significant economic impact on the operations of the defendant governmental employers. Statements by Dr. Charles Pounian, Commissioner of Personnel for the defendant City of Chicago from 1960-1985, and by the late Mayor of the City of Chicago, Harold Washington, lead this court to conclude that Shakman has resulted in considerable budgetary savings for the defendant employers. In his affidavit, Dr. Pounian lists the following reasons the results in Shakman led to a less costly and more productive work force for the defendant City of Chicago:
(a) While there are many pressures to add jobs to the various City departments, the application of job-related criteria in filling the non-exempt positions as a result of the 1983 consent decree should sharply reduce political hiring as a cause of unnecessary hiring, except for positions exempted from the decree.
(b) At the time I left my position as Commissioner of Personnel in 1985, the City was hiring, in general, more highly qualified employees than it was prior to *946 the hiring consent decree. Among the reasons for this are:
(i) The decree requires broader public notice of jobs to be given. This results in a larger pool of applicants and consequently allows a better choice for selection.
(ii) Many qualified persons, who otherwise would not have been interested in City jobs, were interested in and applied for those jobs because they believed that the jobs would not be conditioned on political support and other non-merit factors.
(iii) The development of the Plan of Compliance included the establishment of hiring criteria for all non-exempted positions. It had the effect of extending career service procedures to all covered positions and it directed attention to what should be the focus of hiring  the selection of applicants based on job related criteria.
(iv) As a result of the uniform application of job-related criteria in selection, the City's work force was, at the time I resigned as Commissioner of Personnel on July 1, 1985, better qualified than prior to the entry of the decree. This improvement in the overall level of new employees, which resulted from the extension of merit system hiring practices, has created the potential for substantial improvement in the performance of the City work force. While this potential is dependent on strong executive leadership and good managers in the various City departments, the cost savings should be significant.
(v) The decree reinforced the provisions of the Personnel Ordinance limiting the use of provisional appointments and thereby strengthening the merit system. The combination of the decree and the Personnel Ordinance provide for the basis of an excellent system of merit hiring and promotion.
Pounian Aff., ¶¶ 9(a), 9(b).
In Dr. Pounian's judgment, these benefits have made available cost savings, just to the defendant City of Chicago alone, in an amount in excess of $150,000,000 during the ten-year duration of the Implementation Plan. Dr. Pounian observes:
It is, of course, difficult to assess with precision the amount in dollars of the cost savings to the City which the consent decrees in the Shakman case have brought about. Nonetheless, it is clear that the potential cost savings to the City is substantial. At the time I left the City, its total employee expense per year was approximately $1.1 billion, of which approximately 30% related to jobs that formerly were non-merit [patronage] system jobs. I believe that the consent decree, by improving the quality of the available pool of applicants and by extending merit as the basis of employment decisions, substantially improved, and, with proper and effective management, can continue to improve productivity. I believe that, on a very conservative assumption, the improvement in productivity will be not less than 5%. Assuming a 5% improvement in productivity in the group formerly hired on non-merit system factors, this potential improvement could result in savings of well over $15 million per year.
Pounian Aff., ¶ 10.
By virtue of his many years of experience as Commissioner of Personnel, Dr. Pounian believes that savings similar to those realized by the City have been realized by other defendants as a result of implementation of the consent decree. Id. at ¶ 11. If, as Dr. Pounian suggests, these savings are similar, the total economic benefit to defendants will exceed $250 million.
Although plaintiffs are careful to point out that Dr. Pounian's affidavit is not submitted to establish with numerical precision the exact monetary effect of the outcome in this case, Dr. Pounian's observations are nonetheless recited by this court to underscore the fact that Shakman has resulted in significant budgetary savings for the defendant employers.
Testifying before this court during fairness hearings regarding the consent decree, the late Mayor Harold Washington commented that as a result of Shakman:

*947 the cost of government would be lowered to a great extent because ... many city employees simply do not cut the mustard. There are certain instances in which you have more than enough employees doing a single job. There is a degree of inefficiency, not rampant, not manifest, but it's there. It can be seen, it can be observed, it has been chronicled by the press, by others.
It would improve city management. It is very difficult, for example, for even a superintendent to discipline a subordinate who is in favor or closely connected with a strong Ward Committeeman. By the same token, it is difficult for some Committeemen to vice [sic] certain employees who are strong with members of the Party. It would give, I think, a better sense of management. It would remove politics in that sense from City Government.
* * * * * *
And, lastly, I think this Judgment would once and for all guarantee that the policymakers starting with the Mayor of this city and his immediate policymaking subordinates could extract a day's work for a day's pay from every city employee. And that, to me, is the bottom line. It cannot do it under the circumstances.
Transcript of Fairness Proceedings, June 20, 1983, at 24-27.
The foregoing observations of the late Mayor Washington and Dr. Pounian are quite persuasive. No one could be in a better position to evaluate the cost savings benefits of Shakman than the Mayor of the City of Chicago, and the head of the city's personnel department from 1960 to 1985. Although precise data concerning exact savings resulting from Shakman are not available, this court credits their conclusions that substantial budgetary economies are attributable to the outcome of this case. Though the resulting savings in employment costs immediately benefited the defendant employers, the plaintiff class of taxpayers are also directly advantaged by these efficiencies. Viewed collectively, the Shakman case has resulted in substantial political, social and economic benefits not only for members of the plaintiff classes, but also for all who are affected by the public officers and entities named as defendants in this action.
Although the Seventh Circuit recently reversed the portion of Shakman dealing with partisan hiring practices, this decision has not seriously diminished the success achieved by plaintiffs in this case. First, the Seventh Circuit's ruling in Shakman III does not affect the disparate treatment and termination aspects of the Shakman decrees. Second, a substantial number of defendants bound by the ruling in Shakman II declined to appeal. Thus, to a large extent, the success plaintiffs obtained in Shakman II regarding partisan hiring remains intact.[11]
In light of the preceding discussion, this court concludes the results achieved in Shakman are sufficiently extraordinary to place this case in the class of rare and exceptional cases for which success enhancements are reserved.
The proper method of selecting a success multiplier is to compare the lodestar to the results obtained. Hensley, 461 U.S. at 437-40, 103 S.Ct. at 1941-43. An upward adjustment is proper where the lodestar is significantly lower than the results would warrant, given fee awards in cases where equally successful results were achieved. Delaware Valley I, 478 U.S. at ___, 106 S.Ct. at 3099-3100. Comparing the lodestar to the size and nature of benefits resulting from the outcome in Shakman, the base amount appears to be substantially *948 lower in relative terms than awards in cases with comparable successes. While not small in absolute terms, the lodestar is comparatively modest in relation to fee awards involving similarly large economic benefits. See, e.g., Liberles v. Daniel, 619 F.Supp. 1016, 1019-22 (N.D.Ill.1985) (application of a multiplier of 1.5 results in a $451,000 award in an action involving $13 million in benefits); Brewer v. Southern Union Co., 607 F.Supp. 1511 (D.Colo.1984) (application of multipliers ranging from 3.35 to 1.5 results in fee award of over $8 million where benefit totaled less than $75 million); Phemister v. Harcourt Brace Jovanovich, Inc., No. 77 C 39, slip op. at 16 (Sept. 14, 1984) (application of 1.41 multiplier results in a fee award $785,000 where potential economic benefit ranged from $2.75 million to $10 million); Monroe v. United Airlines, 565 F.Supp. 274, 279-80 (N.D.Ill.1983) (use of a 1.6 multiplier leads to total fee award of nearly $1.3 million where benefit totaled $18 million). As such, this court awards a fee enhancement equal to one third of the lodestar. Although this enhancement is lower than many awarded in cases with comparable results, this court expresses confidence that a 1.333 multiplier will produce a reasonably compensatory fee in light of the success achieved in this case and serve as a sufficient inducement for competent attorneys to accept cases of a similar import in the future.

F. Risk of Nonpayment

Finally, plaintiffs assert that the risk of nonpayment assumed by plaintiffs' attorneys in accepting this case requires an upward adjustment to the lodestar. Plaintiffs note that a contingent fee arrangement existed in this case. Merely compensating for the hours their attorneys reasonably expended litigating this matter, plaintiffs argue, is insufficient to adequately compensate for the substantial risk of nonpayment plaintiffs' attorneys assumed. Since attorneys generally charge a premium for accepting cases on a contingency fee basis, plaintiffs urge that a substantial upward adjustment to the lodestar is necessary to produce a reasonable fee.
After the parties completed submitting arguments on this issue, the decision in Delaware Valley II addressing the propriety of awarding risk multipliers was handed down. As detailed in Part II B of this opinion, a four-member plurality determined in that case that upward adjustments for risk are not permissible under typical fee shifting statutes. Delaware Valley II, 478 U.S. at ___, 107 S.Ct. at 3087. However, because four dissenting justices and one concurring justice were of the view that Congress did not intend to foreclose consideration of risk of nonpayment in setting fee awards under fee shifting statutes, the plurality was compelled to articulate conditions under which such multipliers could be properly awarded. One condition imposed by the plurality and adopted by Justice O'Connor in her concurring opinion is the requirement that evidence be submitted and findings be made that "without risk-enhancement, plaintiffs would have faced substantial difficulties in finding counsel in the local or other relevant market." Id. at ___, 107 S.Ct. at 3089.
Although plaintiffs' submissions on the risk of nonpayment issue predated the ruling in Delaware Valley II, this court entertains serious doubt that plaintiffs could offer convincing evidence on the mentioned requirement. Simply put, this court believes that plaintiffs' counsel would have accepted this case without any promise of a risk enhancement. Plaintiffs' class representatives, Michael Shakman and Paul Lurie were close personal friends of the lawyers who agreed to represent plaintiffs in this action. In fact, three of the four attorneys for whom risk multipliers are sought attended law school together. It was the nature of this case and the personal relationship between the named plaintiffs and their attorneys that motivated counsel to accept this case, not the promise of a risk multiplier.
Moreover, both named plaintiffs were themselves attorneys in 1969 when this action was initiated. Had they been unsuccessful in enlisting the help of their law school friends, little doubt exists that Shakman and Lurie would have proceeded pro *949 se at least until class certification was granted and serious settlement negotiations were begun with defendants in 1971. It is simply not the case that "without risk-enhancement, plaintiff[s] would have faced substantial difficulties in finding counsel in the local or relevant market." As such, plaintiffs' motion for a risk multiplier is denied.

III. CONCLUSION
For the foregoing reasons, plaintiffs' motion for an adjustment to the fees awarded to attorneys Shakman, Johnson, Plotkin and Fross is granted in part and denied in part. This court awards a multiplier of 1.059 to adjust for delay in payment, increasing the base amount or lodestar for the noted attorneys to $897,482 from $847,403. See Appendix A, Table I. This court also awards a 1.333 multiplier for successful results increasing the total award to the four attorneys by $298,862 to $1,196,344. See Appendix A, Table II. Plaintiffs' requests for fee enhancement on the grounds of efficiency, lost opportunity and risk of nonpayment, however, are denied. Thus, with the $36,102 in fees awarded to plaintiffs' other attorneys in Shakman IV, 634 F.Supp. at 909, the total fee award is $1,232,466.[12]See Appendix A, Table III.
IT IS SO ORDERED.

*950 APPENDIX A

 I. Adjustment for Delay in Payment
 Total Fees Using
 Contemporaneous
 Payment Amounts
 Base and Accumulated Adjustment
 Amount Per Present Values
Attorney Shakman IV (Per Column H) $ % 
Mr. Shakman $ 39,125 $ 42,485 $ 3,360 8.6%
Mr. Johnson 466,001 498,393 32,392 7.0%
Mr. Plotkin 150,347 151,627 1,280 0.9%
Mr. Fross 191,840 204,977 13,137 6.8%
 ________ _________ ________ ____
TOTAL $847,403 $897,482 $50,079 5.9%
 ======== ========= ======== ====
 II. Adjustment for Successful Results
 Adjustment
 Adjusted
Attorney Base Amount % $ Fee Award
Mr. Shakman $ 42,485 33.3% $ 14,148 $ 56,633
Mr. Johnson 498,393 33.3% 165,965 664,358
Mr. Plotkin 151,627 33.3% 50,492 202,119
Mr. Fross 204,977 33.3% 68,257 273,234
 _________ ____ _________ __________
TOTAL $897,482 33.3% $298,862 $1,196,344
 ========= ====== ========= ==========
 III. Total Fee Award
Fee award for plaintiffs' remaining attorneys ............... $ 36,102[*]
Fee award for attorneys Shakman, Johnson,
Plotkin and Fross ........................................... 1,196,344
 __________
TOTAL FEE AWARD ............................................. $ 1,232,466
 ===========

*951 APPENDIX B

 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
ATTORNEY:Shakman
(A) (B) (C) (D) (E) (F) (G) (H)
 Three [#] Previous Month's
 [(C) × (D)] Month Accumulated Value Accumulated
 Billing Monthly Contemporaneous T-Bill × Current Month's Present
Year Month Rate Hours Payment Amount Rate T-Bill Rate Value
-------------------------------------------------------------------------------------------------
1969 Aug. 0.556%
 Sept. 30.00 0.00 0.556%
 Oct. 30.00 0.00 $0 0.556% $0.00 $0
 Nov. 30.00 0.00 $0 0.556% $0.00 $0
 Dec. 30.00 0.00 $0 0.556% $0.00 $0
 _____ ______ ______ _____
 0.00 $0 6.677% $0.00
1970 Jan. 35.00 1.90 $67 0.538% $0.00 $67
 Feb. 35.00 0.40 $14 0.538% $0.36 $81
 March 35.00 0.00 $0 0.538% $0.44 $82
 Apr. 35.00 0.00 $0 0.538% $0.44 $82
 May 35.00 0.00 $0 0.538% $0.44 $83
 June 35.00 0.00 $0 0.538% $0.44 $83
 July 35.00 0.00 $0 0.538% $0.45 $84
 Aug. 35.00 0.00 $0 0.538% $0.45 $84
 Sept. 35.00 0.00 $0 0.538% $0.45 $84
 Oct. 35.00 0.00 $0 0.538% $0.45 $85
 Nov. 35.00 1.40 $49 0.538% $0.46 $134
 Dec. 35.00 0.00 $0 0.538% $0.72 $135
 _____ ______ ______
 3.70 $130 6.458%
1971 Jan. 40.00 0.00 $0 0.362% $0.49 $136
 Feb. 40.00 0.00 $0 0.362% $0.49 $136
 March 40.00 5.50 $220 0.362% $0.49 $357
 Apr. 40.00 2.20 $88 0.362% $1.29 $446
 May 40.00 0.00 $0 0.362% $1.62 $447
 June 40.00 13.40 $536 0.362% $1.62 $985
 July 40.00 7.80 $312 0.362% $3.57 $1,301
 Aug. 40.00 7.60 $304 0.362% $4.71 $1,609
 Sept. 40.00 0.00 $0 0.362% $5.83 $1,615
 Oct. 40.00 7.90 $316 0.362% $5.85 $1,937
 Nov. 40.00 4.70 $188 0.362% $7.02 $2,132
 Dec. 40.00 1.20 $48 0.362% $7.73 $2,188
 _____ ______ ______
 50.30 $2,012 4.348%
1972 Jan. 45.00 0.00 $0 0.339% $7.42 $2,195
 Feb. 45.00 0.00 $0 0.339% $7.45 $2,203
 March 45.00 1.50 $68 0.339% $7.47 $2,278
 Apr. 45.00 18.80 $846 0.339% $7.73 $3,131
 May 45.00 3.40 $153 0.339% $10.62 $3,295
 June 45.00 0.30 $14 0.339% $11.18 $3,320
 July 45.00 1.00 $45 0.339% $11.26 $3,376
 Aug. 45.00 7.90 $356 0.339% $11.45 $3,743
 Sept. 45.00 1.50 $68 0.339% $12.70 $3,823

*952
 Oct. 45.00 3.50 $158 0.339% $12.97 $3,994
 Nov. 45.00 2.30 $104 0.339% $13.55 $4,111
 Dec. 45.00 1.00 $45 0.339% $13.95 $4,170
 _____ ______ ______
 41.20 $1,854 4.071%
1973 Jan. 50.00 0.00 $0 0.587% $24.46 $4,194
 Feb. 50.00 0.00 $0 0.587% $24.61 $4,219
 March 50.00 1.00 $50 0.587% $24.75 $4,293
 Apr. 50.00 0.00 $0 0.587% $25.19 $4,319
 May 50.00 0.00 $0 0.587% $25.34 $4,344
 June 50.00 0.00 $0 0.587% $25.49 $4,369
 July 50.00 0.00 $0 0.587% $25.64 $4,395
 Aug. 50.00 0.00 $0 0.587% $25.79 $4,421
 Sept. 50.00 0.00 $0 0.587% $25.94 $4,447
 Oct. 50.00 1.10 $55 0.587% $26.09 $4,528
 Nov. 50.00 0.00 $0 0.587% $26.57 $4,554
 Dec. 50.00 0.00 $0 0.587% $26.72 $4,581
 _____ ______ ______
 2.10 $105 7.041%
1974 Jan. 60.00 0.00 $0 0.657% $30.11 $4,611
 Feb. 60.00 0.00 $0 0.657% $30.30 $4,642
 March 60.00 0.00 $0 0.657% $30.50 $4,672
 Apr. 60.00 0.00 $0 0.657% $30.70 $4,703
 May 60.00 0.00 $0 0.657% $30.91 $4,734
 June 60.00 0.00 $0 0.657% $31.11 $4,765
 July 60.00 0.90 $54 0.657% $31.31 $4,850
 Aug. 60.00 0.00 $0 0.657% $31.87 $4,882
 Sept. 60.00 1.70 $102 0.657% $32.08 $5,016
 Oct. 60.00 9.60 $576 0.657% $32.96 $5,625
 Nov. 60.00 1.10 $66 0.657% $36.97 $5,728
 Dec. 60.00 1.50 $90 0.657% $37.64 $5,856
 _____ ______ ______
 14.00 $888 7.886%
1975 Jan. 60.00 4.10 $246 0.487% $28.49 $6,130
 Feb. 60.00 0.50 $30 0.487% $29.82 $6,190
 March 60.00 4.10 $246 0.487% $30.11 $6,466
 Apr. 60.00 14.50 $870 0.487% $31.46 $7,368
 May 60.00 1.30 $78 0.487% $35.84 $7,481
 June 60.00 0.70 $42 0.487% $36.40 $7,560
 July 60.00 0.00 $0 0.487% $36.78 $7,597
 Aug. 60.00 0.00 $0 0.487% $36.96 $7,633
 Sept. 60.00 0.00 $0 0.487% $37.14 $7,671
 Oct. 60.00 1.80 $108 0.487% $37.32 $7,816
 Nov. 60.00 0.10 $6 0.487% $38.02 $7,860
 Dec. 60.00 1.00 $60 0.487% $38.24 $7,950
 _____ ______ ______
 28.10 $1,686 5.838%
1976 Jan. 65.00 0.00 $0 0.416% $33.09 $7,991
 Feb. 65.00 0.00 $0 0.416% $33.22 $8,025
 March 65.00 0.00 $0 0.416% $33.36 $8,058

*953
 Apr. 65.00 0.40 $26 0.416% $33.50 $8,117
 May 65.00 0.00 $0 0.416% $33.75 $8,151
 June 65.00 3.30 $215 0.416% $33.89 $8,400
 July 65.00 0.00 $0 0.416% $34.92 $8,434
 Aug. 65.00 0.00 $0 0.416% $35.07 $8,470
 Sept. 65.00 0.80 $52 0.416% $35.21 $8,557
 Oct. 65.00 0.20 $13 0.416% $35.57 $8,605
 Nov. 65.00 0.00 $0 0.416% $35.78 $8,641
 Dec. 65.00 0.00 $0 0.416% $35.93 $8,677
 _____ ______ ______
 4.70 $306 4,989%
1977 Jan. 75.00 0.00 $0 0.439% $38.07 $8,715
 Feb. 75.00 0.00 $0 0.439% $38.24 $8,753
 March 75.00 0.00 $0 0.439% $38.41 $8,792
 Apr. 75.00 0.00 $0 0.439% $38.57 $8,830
 May 75.00 2.20 $165 0.439% $38.74 $9,034
 June 75.00 2.40 $180 0.439% $39.64 $9,254
 July 75.00 1.00 $75 0.439% $40.60 $9,369
 Aug. 75.00 1.00 $75 0.439% $41.11 $9,485
 Sept. 75.00 0.00 $0 0.439% $41.62 $9,527
 Oct. 75.00 0.20 $15 0.439% $41.80 $9,584
 Nov. 75.00 0.00 $0 0.439% $42.05 $9,626
 Dec. 75.00 0.30 $25 0.439% $42.23 $9,691
 _____ ______ ______
 7.10 $533 5.265%
1978 Jan. 75.00 3.00 $225 0.602% $58.31 $9,974
 Feb. 75.00 0.00 $0 0.602% $60.02 $10,034
 March 75.00 0.00 $0 0.602% $60.38 $10,094
 Apr. 75.00 0.00 $0 0.602% $60.74 $10,155
 May 75.00 0.60 $45 0.602% $61.11 $10,261
 June 75.00 0.00 $0 0.602% $61.75 $10,323
 July 85.00 0.60 $51 0.602% $62.12 $10,436
 Aug. 85.00 0.50 $43 0.602% $62.80 $10,541
 Sept. 85.00 0.00 $0 0.602% $63.43 $10,605
 Oct. 85.00 0.00 $0 0.602% $63.81 $10,669
 Nov. 85.00 0.00 $0 0.602% $64.20 $10,733
 Dec. 85.00 0.60 $51 0.602% $64.58 $10,848
 _____ ______ ______
 5.30 $415 7.221%
1979 Jan. 85.00 0.00 $0 0.837% $90.77 $10,939
 Feb. 85.00 0.00 $0 0.837% $91.53 $11,031
 March 85.00 0.00 $0 0.837% $92.30 $11,123
 Apr. 85.00 0.00 $0 0.837% $93.07 $11,216
 May 85.00 0.00 $0 0.837% $93.85 $11,310
 June 85.00 0.00 $0 0.837% $94.64 $11,404
 July 85.00 0.00 $0 0.837% $95.43 $11,500
 Aug. 90.00 0.00 $0 0.837% $96.23 $11,596
 Sept. 90.00 3.50 $315 0.837% $97.03 $12,008
 Oct. 90.00 8.10 $729 0.837% $100.48 $12,838
 Nov. 90.00 0.00 $0 0.837% $107.42 $12,945
 Dec. 90.00 0.00 $0 0.837% $100.32 $13,053
 _____ ______ ______
 11.60 $1,044 10.041%

*954
1980 Jan. 90.00 0.30 $27 0.959% $125.16 $13,206
 Feb. 100.00 0.00 $0 0.959% $126.62 $13,332
 March 100.00 0.40 $40 0.959% $127.83 $13,500
 Apr. 100.00 0.20 $20 0.959% $129.44 $13,649
 May 100.00 0.80 $80 0.959% $130.88 $13,860
 June 100.00 0.10 $10 0.959% $132.90 $14,003
 July 115.00 0.20 $23 0.959% $134.27 $14,160
 Aug. 115.00 0.00 $0 0.959% $135.78 $14,296
 Sept. 115.00 0.50 $58 0.959% $137.08 $14,491
 Oct. 115.00 0.10 $127 0.959% $138.94 $14,756
 Nov. 115.00 0.10 $12 0.959% $141.49 $14,909
 Dec. 115.00 0.00 $0 0.959% $142.95 $15,052
 _____ ______ ______
 3.70 $396 11.506%
1981 Jan. 115.00 0.40 $46 1.169% $175.97 $15,274
 Feb. 115.00 0.20 $23 1.169% $178.57 $15,476
 March 115.00 1.80 $207 1.169% $180.92 $15,864
 Apr. 115.00 3.50 $403 1.169% $185.46 $16,452
 May 115.00 0.00 $0 1.169% $192.33 $16,644
 June 125.00 0.30 $38 1.169% $194.58 $16,876
 July 125.00 1.30 $163 1.169% $197.30 $17,236
 Aug. 125.00 0.30 $38 1.169% $201.50 $17,475
 Sept. 125.00 0.00 $0 1.169% $204.30 $17,679
 Oct. 125.00 0.50 $63 1.169% $206.68 $17,948
 Nov. 125.00 0.00 $0 1.169% $209.83 $18,158
 Dec. 125.00 3.50 $438 1.169% $212.28 $18,808
 ______ ______ _______
 11.80 $1,416 14.029%
1982 Jan. 125.00 3.90 $488 0.891% $167.48 $19,463
 Feb. 125.00 1.90 $238 0.891% $173.32 $19,874
 March 125.00 3.00 $375 0.891% $176.98 $20,426
 Apr. 125.00 0.00 $0 0.891% $181.89 $20,600
 May 125.00 0.40 $50 0.891% $183.51 $20,841
 June 125.00 2.40 $300 0.891% $185.59 $21,327
 July 125.00 1.20 $150 0.891% $189.91 $21,667
 Aug. 125.00 0.00 $0 0.891% $192.94 $21,860
 Sept. 125.00 0.00 $0 0.891% $194.66 $22,054
 Oct. 125.00 0.00 $0 0.891% $196.39 $22,251
 Nov. 125.00 0.30 $38 0.891% $198.14 $22,486
 Dec. 125.00 0.00 $0 0.891% $200.24 $22,686
 _____ ______ _______
 13.10 $1,630 10.686%
1983 Jan. 125.00 0.00 $0 0.719% $163.15 $22,850
 Feb. 130.00 0.00 $0 0.719% $164.33 $23,014
 March 130.00 0.40 $52 0.719% $165.51 $23,231
 Apr. 130.00 0.50 $65 0.719% $167.07 $23,464
 May 130.00 7.40 $962 0.719% $168.74 $24,594
 June 130.00 4.10 $533 0.719% $176.87 $25,304
 July 130.00 3.60 $468 0.719% $181.98 $25,954

*955
 Aug. 130.00 2.40 $312 0.719% $106.65 $26,453
 Sept. 130.00 0.20 $26 0.719% $190.24 $26,669
 Oct. 130.00 0.40 $52 0.719% $191.79 $26,913
 Nov. 130.00 0.50 $65 0.719% $193.55 $27,171
 Dec. 130.00 0.80 $194 0.719% $195.41 $27,471
 _____ ______ ______
 20.30 $2,639 8.630%
1984 Jan. 130.00 0.30 $39 0.798% $219.31 $27,729
 Feb. 140.00 0.00 $0 0.798% $221.37 $27,950
 March 140.00 5.00 $812 0.798% $223.14 $28,986
 Apr. 140.00 4.00 $560 0.798% $231.40 $29,777
 May 140.00 0.50 $70 0.798% $237.72 $30,885
 June 140.00 2.00 $280 0.798% $240.18 $30,605
 July 140.00 2.00 $280 0.798% $244.33 $31,129
 Aug. 140.00 0.40 $56 0.798% $248.52 $31,434
 Sept. 140.00 0.00 $0 0.798% $250.95 $31,685
 Oct. 140.00 19.50 $2,730 0.798% $252.95 $34,668
 Nov. 140.00 0.00 $0 0.798% $276.76 $34,944
 Dec. 140.00 0.00 $0 0.798% $278.97 $35,223
 _____ ______ ______
 34.50 $4,827 9.580%
1985 Jan. 155.00 0.00 $0 0.623% $219.56 $35,443
 Feb. 155.00 0.00 $0 0.623% $220.93 $35,664
 March 155.00 0.00 $0 0.623% $222.30 $35,886
 Apr. 155.00 0.00 $0 0.623% $223.69 $36,110
 May 155.00 0.00 $0 0.623% $225.08 $36,335
 June 155.00 0.00 $0 0.623% $226.49 $36,561
 July 155.00 0.00 $0 0.623% $227.90 $36,789
 Aug. 155.00 0.00 $0 0.623% $229.32 $37,019
 Sept. 155.00 0.00 $0 0.623% $230.75 $37,249
 Oct. 155.00 0.00 $0 0.623% $232.19 $37,482
 Nov. 155.00 0.00 $0 0.623% $233.64 $37,715
 Dec. 155.00 0.00 $0 0.623% $235.09 $37,950
 _____ ______ ______
 0.00 $0 7.480%
1986 Jan. 0.00 $0 0.498% $189.12 $38,139
 Feb. 0.00 $0 0.498% $190.06 $38,330
 March 0.00 $0 0.498% $191.01 $38,521
 Apr. 0.00 $0 0.498% $191.96 $38,712
 May 0.00 $0 0.498% $192.92 $38,905
 June 0.00 $0 0.498% $193.88 $39,099
 July 0.00 $0 0.498% $194.84 $39,294
 Aug. 0.00 $0 0.498% $195.82 $39,490
 Sept. 0.00 $0 0.498% $196.79 $39,687
 Oct. 0.00 $0 0.498% $197.77 $39,884
 Nov. 0.00 $0 0.498% $198.76 $40,083
 Dec. 0.00 $0 0.498% $199.75 $40,283
 _____ ______ ______
 0.00 $0 5.980%
 Jan. 0.00 $0 0.485% $195.37 $40,478
*956
 Feb. 0.00 $0 0.485% $196.32 $40,675
 March 0.00 $0 0.485% $197.27 $40,872
 Apr. 0.00 $0 0.485% $198.23 $41,070
 May 0.00 $0 0.485% $199.19 $41,269
 June 0.00 $0 0.485% $200.16 $41,470
 July 0.00 $0 0.485% $201.13 $41,671
 Aug. 0.00 $0 0.485% $202.10 $41,873
 Sept. 0.00 $0 0.485% $203.08 $42,076
 Oct. 0.00 $0 0.485% $204.07 $42,280
 Nov. 0.00 $0 0.485% $205.06 $42,485
 _____ _______ ______
 0.00 $0 5.820%
 252.30 $19.886 $42,485
 ====== ======= =======

*957 APPENDIX C

 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
ATTORNEY: JOHNSON
 (A) (B) (C) (D) (E) (F) (G) (H)
 Three % Previous Month's
 [(C) × (D)] Month Accumulated Value Accumulated
 Billing Monthly Contemporaneous T-Bill × Current Month's Present
Year Month Rate Hours Payment Amount Rate T-Bill Rate Value
---------------------------------------------------------------------------------------------------------
1969 Aug. 30.00 50.00 $1,500 0.556% $1,500
 Sept. 30.00 50.00 $1,500 0.556% $8.35 $3,008
 Oct. 30.00 37.25 $1,118 0.556% $16.74 $4,143
 Nov. 30.00 117.00 $3,510 0.556% $23.05 $7,676
 Dec. 30.00 0.00 $0 0.556% $42.71 $7,718
 ______ ______ ______
 254.25 $7,628 6.677%
1970 Jan. 30.00 0.25 $8 0.538% $41.54 $7,767
 Feb. 30.00 18.50 $555 0.538% $41.80 $8,364
 March 35.00 1.50 $53 0.538% $45.01 $8,462
 Apr. 35.00 0.00 $0 0.538% $45.54 $8,507
 May 35.00 4.50 $158 0.538% $45.78 $8,711
 June 35.00 6.50 $228 0.538% $46.88 $8,985
 July 35.00 5.00 $175 0.538% $48.35 $9,208
 Aug. 35.00 1.25 $44 0.538% $49.56 $9,302
 Sept. 35.00 0.00 $0 0.538% $50.06 $9,352
 Oct. 35.00 11.00 $385 0.538% $50.33 $9,787
 Nov. 35.00 19.75 $691 0.538% $52.67 $10,531
 Dec. 35.00 50.00 $1,750 0.538% $56.67 $12,338
 ______ ______ ______
 118.25 $4,045 6,458%
1971 Jan. 35.00 13.00 $455 0.362% $44.70 $12,837
 Feb. 35.00 48.75 $1,706 0.362% $46.51 $14,590
 March 40.00 54.75 $2,190 0.362% $52.86 $16,833
 Apr. 40.00 6.75 $270 0.362% $60.99 $17,164
 May 40.00 14.25 $570 0.362% $62.19 $17,796
 June 40.00 35.00 $1,400 0.362% $64.48 $19,261
 July 40.00 23.00 $920 0.362% $69.79 $20,250
 Aug. 40.00 16.75 $670 0.362% $73.37 $20,994
 Sept. 40.00 25.50 $1,020 0.362% $76.07 $22,090
 Oct. 40.00 51.50 $2,060 0.362% $80.04 $24,230
 Nov. 40.00 17.00 $680 0.362% $87.79 $24,998
 Dec. 40.00 1.50 $60 0.362% $90.57 $25,148
 ______ _______ ______
 307.75 $12,001 4.348%
1972 Jan. 50.00 24.50 $1,225 0.339% $85.32 $26,458
 Feb. 50.00 22.75 $1,138 0.339% $89.76 $27,686
 March 50.00 12.75 $638 0.339% $93.92 $28,417
 Apr. 50.00 33.25 $1,663 0.339% $96.41 $30,176
 May 50.00 41.00 $2,050 0.339% $102.37 $32,328
 June 50.00 23.25 $1,163 0.339% $109.67 $33,601
 July 50.00 21.00 $1,050 0.339% $113.99 $34,765
 Aug. 50.00 76.75 $3,838 0.339% $117.94 $38,720
 Sept. 50.00 20.75 $1,038 0.339% $131.36 $39,889

*958
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Oct. 50.00 29.50 $1,475 0.339% $135.32 $41,499
 Nov. 50.00 26.50 $1,325 0.339% $140.79 $42,965
 Dec. 50.00 6.75 $338 0.339% $145.76 $43,448
 ______ _______ ______
 338.75 $16,938 4.071%
1973 Jan. 50.00 12.75 $638 0.587% $254.93 $44,341
 Feb. 50.00 21.75 $1,088 0.587% $260.17 $45,688
 March 50.00 21.75 $1,088 0.587% $268.08 $47,044
 Apr. 50.00 18.00 $900 0.587% $276.03 $48,220
 May 50.00 1.25 $63 0.587% $282.93 $48,565
 June 50.00 0.00 $0 0.587% $284.96 $48,850
 July 50.00 1.50 $75 0.587% $286.63 $49,212
 Aug. 50.00 9.75 $488 0.587% $288.75 $49,988
 Sept. 50.00 0.00 $0 0.587% $293.31 $50,282
 Oct. 50.00 17.50 $875 0.587% $295.03 $51,452
 Nov. 50.00 2.25 $113 0.587% $301.89 $51,866
 Dec. 50.00 15.00 $750 0.587% $304.32 $52,920
 ______ ______ ______
 121.50 $6,075 7.041%
1974 Jan. 50.00 12.25 $613 0.657% $347.77 $53,881
 Feb. 50.00 28.25 $1,413 0.657% $354.09 $55,647
 March 50.00 0.00 $0 0.657% $365.69 $56,013
 Apr. 55.00 4.75 $261 0.657% $368.10 $56,642
 May 55.00 3.00 $165 0.657% $372.23 $57,179
 June 60.00 7.00 $420 0.657% $375.76 $57,975
 July 60.00 17.75 $1,065 0.657% $380.99 $59,421
 Aug. 60.00 8.25 $495 0.657% $390.50 $60,307
 Sept. 60.00 23.25 $1,395 0.657% $396.32 $62,098
 Oct. 60.00 29.25 $1,755 0.657% $408.09 $64,261
 Nov. 60.00 5.50 $330 0.657% $422.30 $65,013
 Dec. 60.00 27.75 $1,665 0.657% $427.25 $67,106
 ______ ______ ______
 167.00 $9,576 7.886%
1975 Jan. 60.00 52.00 $3,120 0.487% $326.47 $70,552
 Feb. 60.00 11.00 $748 0.487% $343.24 $71,643
 March 60.00 23.00 $1,564 0.487% $348.54 $73,556
 Apr. 60.00 14.00 $952 0.487% $357.85 $74,866
 May 60.00 10.75 $731 0.487% $364.22 $75,961
 June 60.00 6.50 $442 0.487% $369.55 $76,773
 July 60.00 5.50 $374 0.487% $373.50 $77,520
 Aug. 60.00 0.50 $34 0.487% $377.13 $77,931
 Sept. 60.00 39.75 $2,703 0.487% $379.13 $81,013
 Oct. 60.00 52.00 $3,536 0.487% $394.13 $84,943
 Nov. 60.00 6.00 $408 0.487% $413.25 $85,765
 Dec. 60.00 0.00 $0 0.487% $417.25 $86,182
 ______ _______ ______
 221.00 $14,612 5.838%
1976 Jan. 72.00 2.00 $144 0.416% $358.30 $86,684
 Feb. 72.00 4.75 $342 0.416% $360.39 $87,387
 March 72.00 6.00 $432 0.416% $363.31 $88,182

*959
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Apr. 72.00 5.50 $396 0.416% $366.62 $88,945
 May 72.00 1.25 $90 0.416% $369.79 $89,404
 June 72.00 9.00 $648 0.416% $371.70 $90,424
 July 72.00 5.50 $396 0.416% $375.94 $91,196
 Aug. 72.00 16.00 $1,152 0.416% $379.15 $92,727
 Sept. 72.00 5.00 $360 0.416% $385.51 $93,473
 Oct. 72.00 2.00 $144 0.416% $388.61 $94,005
 Nov. 72.00 4.00 $288 0.416% $390.83 $94,684
 Dec. 72.00 9.75 $702 0.416% $393.65 $95,780
 ______ ______ ______
 70.75 $5,094 4.989%
1977 Jan. 80.00 9.25 $740 0.439% $420.23 $96,940
 Feb. 80.00 10.00 $800 0.439% $425.32 $98,165
 March 80.00 5.25 $420 0.439% $430.70 $99,016
 Apr. 80.00 8.00 $640 0.439% $434.43 $100,090
 May 80.00 12.75 $1,020 0.439% $439.15 $101,550
 June 80.00 4.50 $360 0.439% $445.55 $102,355
 July 80.00 44.25 $3,540 0.439% $449.00 $106,344
 Aug. 80.00 63.75 $5,100 0.439% $466.50 $111,911
 Sept. 80.00 3.00 $240 0.439% $491.01 $112,642
 Oct. 80.00 8.00 $640 0.439% $494.22 $113,776
 Nov. 80.00 14.00 $1,120 0.439% $499.19 $115,395
 Dec. 80.00 0.75 $60 0.439% $506.30 $115,961
 ______ _______ ______
 103.50 $14,680 5.265%
1978 Jan. 85.00 12.25 $1,041 0.602% $697.80 $117,700
 Feb. 85.00 44.00 $3,740 0.602% $708.26 $122,149
 March 85.00 34.75 $2,954 0.602% $735.03 $125,838
 Apr. 85.00 1.25 $106 0.602% $757.23 $126,701
 May 85.00 5.00 $425 0.602% $762.42 $127,888
 June 85.00 3.00 $255 0.602% $769.57 $128,913
 July 85.00 25.75 $2,189 0.602% $775.73 $131,877
 Aug. 85.00 1.25 $106 0.602% $793.57 $132,777
 Sept. 85.00 0.00 $0 0.602% $798.99 $133,576
 Oct. 85.00 0.00 $0 0.602% $803.80 $134,380
 Nov. 85.00 0.00 $0 0.602% $808.63 $135,189
 Dec. 85.00 1.25 $106 0.602% $813.50 $136,108
 ______ _______ ______
 120.50 $10,923 7.221%
1979 Jan. 92.00 1.25 $115 0.837% $1,138.89 $137,362
 Feb. 92.00 0.25 $23 0.837% $1,149.38 $138,535
 March 92.00 0.75 $69 0.837% $1,159.19 $139,763
 Apr. 92.00 0.25 $23 0.837% $1,169.47 $140,955
 May 92.00 0.75 $69 0.837% $1,179.44 $142,204
 June 92.00 0.00 $0 0.837% $1,189.89 $143,394
 July 92.00 0.00 $0 0.837% $1,199.85 $144,594
 Aug. 92.00 5.50 $506 0.837% $1,209.89 $146,309
 Sept. 92.00 8.50 $782 0.837% $1,224.24 $148,316
 Oct. 99.00 5.25 $520 0.837% $1,241.03 $150,076
 Nov. 99.00 4.75 $470 0.837% $1,255.77 $151,803
 Dec. 99.00 0.00 $0 0.837% $1,270.21 $153,073
 _____ ______ _______
 27.25 $2,577 10.041%

*960
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
1980 Jan. 99.00 0.50 $50 0.959% $1,467.71 $154,590
 Feb. 99.00 4.75 $470 0.959% $1,482.26 $156,542
 March 106.00 0.00 $0 0.959% $1,500.98 $158,043
 Apr. 106.00 0.00 $0 0.959% $1,515.37 $159,559
 May 106.00 0.25 $27 0.959% $1,529.90 $161,115
 June 106.00 0.75 $80 0.959% $1,544.83 $162,740
 July 106.00 0.75 $80 0.959% $1,560.40 $164,379
 Aug. 106.00 1.50 $159 0.959% $1,576.12 $166,115
 Sept. 106.00 10.75 $1,140 0.959% $1,592.76 $168,847
 Oct. 106.00 16.25 $1,723 0.959% $1,618.96 $172,188
 Nov. 106.00 5.00 $530 0.959% $1,651.00 $174,369
 Dec. 106.00 0.00 $0 0.959% $1,671.91 $176,041
 _____ ______ _______
 40.50 $4,256 11.506%
1981 Jan. 125.00 2.75 $344 1.169% $2,050.07 $178,443
 Feb. 125.00 0.00 $0 1.169% $2,086.15 $180,529
 March 125.00 17.50 $2,188 1.169% $2,110.54 $184,827
 Apr. 125.00 3.50 $438 1.169% $2,160.70 $187,425
 May 125.00 0.00 $0 1.169% $2,191.16 $189,617
 June 125.00 1.25 $156 1.169% $2,216.78 $191,990
 July 125.00 0.75 $94 1.169% $2,244.52 $194,328
 Aug. 125.00 0.50 $63 1.169% $2,271.86 $196,662
 Sept. 125.00 0.00 $0 1.169% $2,299.15 $198,961
 Oct. 125.00 0.00 $0 1.169% $2,326.02 $201,287
 Nov. 125.00 10.50 $1,313 1.169% $2,353.22 $204,953
 Dec. 125.00 1.50 $188 1.169% $2,396.07 $207,537
 _____ ______ _______
 38.25 $4,781 14.029%
1982 Jan. 135.00 3.50 $473 0.891% $1,848.11 $209,857
 Feb. 135.00 10.00 $1,350 0.891% $1,868.78 $213,076
 March 135.00 35.75 $4,826 0.891% $1,897.44 $219,800
 Apr. 135.00 33.25 $4,489 0.891% $1,957.32 $226,246
 May 135.00 20.75 $2,801 0.891% $2,014.72 $231,062
 June 135.00 58.75 $7,931 0.891% $2,057.61 $241,051
 July 135.00 58.50 $7,898 0.891% $2,146.56 $251,095
 Aug. 135.00 8.50 $1,140 0.891% $2,236.00 $254,478
 Sept. 135.00 0.50 $68 0.891% $2,266.13 $256,812
 Oct. 135.00 0.00 $0 0.891% $2,286.91 $259,099
 Nov. 135.00 4.75 $641 0.891% $2,307.27 $262,047
 Dec. 135.00 7.75 $1,046 0.891% $2,333.53 $265,427
 ______ _______ _______
 242.00 $32,670 10.686%
1983 Jan. 145.00 32.00 $4,640 0.719% $1,908.86 $271,976
 Feb. 145.00 49.25 $7,141 0.719% $1,955.96 $281,073
 March 145.00 16.75 $2,429 0.719% $2,021.38 $285,523
 Apr. 145.00 14.25 $2,066 0.719% $2,053.39 $289,643
 May 145.00 119.75 $17,364 0.719% $2,083.02 $309,090
 June 145.00 104.00 $15,080 0.719% $2,222.87 $326,393
 July 145.00 14.50 $2,103 0.719% $2,347.31 $330,842

*961
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Aug. 145.00 0.00 $0 0.719% $2,379.31 $333,222
 Sept. 145.00 5.25 $761 0.719% $2,396.42 $336,379
 Oct. 145.00 9.75 $1,414 0.719% $2,419.13 $340,212
 Nov. 145.00 15.50 $2,248 0.719% $2,446.69 $344,906
 Dec. 145.00 17.50 $2,538 0.719% $2,480.45 $349,924
 ______ _______ ______
 398.50 $57,783 8.630%
1984 Jan. 160.00 31.50 $5,040 0.798% $2,793.56 $357,758
 Feb. 160.00 2.75 $440 0.798% $2,856.10 $361,054
 March 160.00 18.00 $2,880 0.798% $2,882.42 $366,816
 Apr. 160.00 32.25 $5,160 0.798% $2,928.42 $374,905
 May 160.00 23.25 $3,720 0.798% $2,992.99 $381,618
 June 160.00 22.75 $3,640 0.798% $3,046.58 $388,304
 July 160.00 15.00 $2,400 0.798% $3,099.96 $393,804
 Aug. 160.00 1.50 $240 0.798% $3,143.87 $397,188
 Sept. 160.00 9.50 $1,520 0.798% $3,170.89 $401,879
 Oct. 160.00 10.00 $1,600 0.798% $3,208.34 $406,688
 Nov. 160.00 0.00 $0 0.798% $3,246.72 $409,934
 Dec. 160.00 0.00 $0 0.798% $3,272.64 $413,207
 ______ _______ ______
 166.50 $26,640 9.580%
1985 Jan. 165.00 0.00 $0 0.623% $2,575.66 $415,783
 Feb. 165.00 0.00 $0 0.623% $2,591.71 $418,374
 March 165.00 0.00 $0 0.623% $2,607.87 $420,982
 Apr. 165.00 0.00 $0 0.623% $2,624.12 $423,606
 May 165.00 0.00 $0 0.623% $2,640.48 $426,247
 June 165.00 0.00 $0 0.623% $2,656.94 $428,904
 July 165.00 0.00 $0 0.623% $2,673.50 $431,577
 Aug. 165.00 0.00 $0 0.623% $2,690.16 $434,267
 Sept. 165.00 0.00 $0 0.623% $2,706.93 $436,974
 Oct. 165.00 0.00 $0 0.623% $2,723.81 $439,698
 Nov. 165.00 0.00 $0 0.623% $2,740.78 $442,439
 Dec. 165.00 0.00 $0 0.623% $2,757.87 $445,197
 ______ _______ ______
 0.00 $0 7.480%
1986 Jan. 0.00 $0 0.498% $2,218.56 $447,415
 Feb. 0.00 $0 0.498% $2,229.62 $449,645
 March 0.00 $0 0.498% $2,240.73 $451,886
 Apr. 0.00 $0 0.498% $2,251.90 $454,138
 May 0.00 $0 0.498% $2,263.12 $456,401
 June 0.00 $0 0.498% $2,274.40 $458,675
 July 0.00 $0 0.498% $2,285.73 $460,961
 Aug. 0.00 $0 0.498% $2,297.12 $463,258
 Sept. 0.00 $0 0.498% $2,300.57 $465,566
 Oct. 0.00 $0 0.498% $2,320.07 $467,887
 Nov. 0.00 $0 0.498% $2,331.63 $470,218
 Dec. 0.00 $0 0.498% $2,343.25 $472,561
 ______ _______ ______
 0.00 $0 5.980%
1987 Jan. 0.00 $0 0.485% $2,291.92 $474,853

*962
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Feb. 0.00 $0 0.485% $2,303.04 $477,156
 March 0.00 $0 0.485% $2,314.21 $479,471
 Apr. 0.00 $0 0.485% $2,325.43 $481,796
 May 0.00 $0 0.485% $2,336.71 $484,133
 June 0.00 $0 0.485% $2,348.04 $486,481
 July 0.00 $0 0.485% $2,359.43 $488,840
 Aug. 0.00 $0 0.485% $2,370.88 $491,211
 Sept. 0.00 $0 0.485% $2,382.37 $493,593
 Oct. 0.00 $0 0.485% $2,393.93 $495,987
 Nov. 0.00 $0 0.485% $2,405.54 $498,393
 ______ ________ ______
 0.00 $0 5.820%
 2,824.25 $230,278 $498,393
 ======== ======== ========
 Represents average 3 month T-Bill rate for entire year.

*963 APPENDIX D

 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
ATTORNEY: FROSS
 (A) (B) (C) (D) (E) (F) (G) (H)
 Three[#] Previous Month's
 [(C) × (D)] Month Accumulated Value Accumulated
 Billing Monthly Contemporaneous T-Bill × Current Month's Present
Year Month Rate Hours Payment Amount Rate T-Bill Rate Value
-------------------------------------------------------------------------------------------------
1969 Aug. 0.556%
 Sept. 0.556%
 Oct. 33.00 52.10 $1,719 0.556% $0.00 $1,719
 Nov. 33.00 30.00 $990 0.556% $9.56 $2,719
 Dec. 33.00 9.50 $314 0.556% $15.13 $3,047
 _____ ______ ______ ______
 91.60 $3,023 6.677% $24.69
1970 Jan. 33.00 7.70 $254 0.538% $16.40 $3,318
 Feb. 33.00 10.00 $330 0.538% $17.85 $3,666
 March 33.00 0.00 $0 0.538% $19.73 $3,685
 Apr. 33.00 0.00 $0 0.538% $19.83 $3,705
 May 33.00 1.00 $33 0.538% $19.94 $3,758
 June 35.00 1.00 $35 0.538% $20.22 $3,813
 July 35.00 0.00 $0 0.538% $20.52 $3,834
 Aug. 35.00 0.00 $0 0.538% $20.63 $3,854
 Sept. 35.00 0.00 $0 0.538% $20.74 $3,875
 Oct. 35.00 6.80 $238 0.538% $20.85 $4,134
 Nov. 35.00 4.30 $151 0.538% $22.25 $4,307
 Dec. 35.00 11.20 $392 0.538% $23.18 $4,722
 _____ ______ ______
 42.00 $1,433 6.458%
1971 Jan. 35.00 5.30 $186 0.362% $17.11 $4,925
 Feb. 35.00 30.70 $1,075 0.362% $17.84 $6,017
 March 35.00 25.50 $893 0.362% $21.80 $6,931
 Apr. 35.00 1.50 $53 0.362% $25.11 $7,009
 May 35.00 3.00 $105 0.362% $25.40 $7,139
 June 35.00 8.80 $308 0.362% $25.87 $7,473
 July 38.00 1.90 $72 0.362% $27.08 $7,572
 Aug. 38.00 0.00 $0 0.362% $27.44 $7,600
 Sept. 38.00 0.00 $0 0.362% $27.54 $7,627
 Oct. 38.00 18.90 $718 0.362% $27.64 $8,373
 Nov. 38.00 7.50 $285 0.362% $30.34 $8,689
 Dec. 38.00 0.00 $0 0.362% $31.48 $8,720
 ______ ______ ______
 103.10 $3,693 4.348%
1972 Jan. 38.00 7.80 $296 0.339% $29.58 $9,046
 Feb. 38.00 14.10 $536 0.339% $30.69 $9,612
 March 38.00 2.00 $76 0.339% $32.61 $9,721
 Apr. 38.00 3.10 $118 0.339% $32.98 $9,872
 May 38.00 0.00 $0 0.339% $33.49 $9,905
 June 38.00 1.50 $57 0.339% $33.60 $9,996
 July 38.00 0.00 $0 0.339% $33.91 $10,030
 Aug. 38.00 0.00 $0 0.339% $34.03 $10,064
 Sept. 41.00 9.20 $377 0.339% $34.14 $10,475

*964
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Oct. 41.00 22.20 $910 0.339% $35.54 $11,421
 Nov. 41.00 3.00 $123 0.339% $38.75 $11,583
 Dec. 41.00 1.30 $53 0.339% $39.29 $11,675
 _____ ______ ______
 64.20 $2,547 4.071%
1973 Jan. 43.00 2.60 $112 0.587% $68.50 $11,856
 Feb. 43.00 3.40 $146 0.587% $69.56 $12,071
 March 43.00 8.50 $366 0.587% $70.83 $12,508
 Apr. 43.00 10.10 $434 0.587% $73.39 $13,015
 May 43.00 3.30 $142 0.587% $76.37 $13,234
 June 43.00 0.00 $0 0.587% $77.65 $13,311
 July 46.00 1.30 $60 0.587% $78.10 $13,449
 Aug. 465.00 0.00 $0 0.587% $78.91 $13,528
 Sept. 46.00 0.00 $0 0.587% $79.38 $13,607
 Oct. 46.00 3.60 $166 0.587% $79.84 $13,853
 Nov. 46.00 5.90 $271 0.587% $81.28 $14,206
 Dec. 46.00 0.00 $0 0.587% $83.35 $14,289
 _____ ______ _______
 38.70 $1,697 7.041%
1974 Jan. 46.00 4.50 $207 0.657% $93.90 $14,590
 Feb. 46.00 0.80 $37 0.657% $95.88 $14,723
 March 46.00 0.00 $0 0.657% $96.75 $14,819
 Apr. 46.00 9.50 $437 0.657% $97.39 $15,354
 May 46.00 0.00 $0 0.657% $100.90 $15,455
 June 46.00 1.20 $55 0.657% $101.56 $15,611
 July 50.00 4.20 $210 0.657% $102.59 $15,924
 Aug. 50.00 0.00 $0 0.657% $104.65 $16,029
 Sept. 50.00 1.80 $90 0.657% $105.33 $16,224
 Oct. 50.00 12.60 $630 0.657% $106.62 $16,961
 Nov. 50.00 3.80 $190 0.657% $111.46 $17,262
 Dec. 50.00 0.00 $0 0.657% $113.44 $17,375
 _____ ______ ______
 38.40 $1,856 7.886%
1975 Jan. 60.00 4.20 $252 0.487% $84.53 $17,712
 Feb. 60.00 0.00 $0 0.487% $86.17 $17,798
 March 66.00 1.00 $66 0.487% $86.59 $17,951
 Apr. 66.00 11.60 $766 0.487% $87.33 $18,804
 May 66.00 7.10 $469 0.487% $91.48 $19,364
 June 66.00 2.60 $172 0.487% $94.20 $19,630
 July 66.00 1.60 $106 0.487% $95.50 $19,831
 Aug. 66.00 1.20 $79 0.487% $96.48 $20,006
 Sept. 66.00 1.50 $99 0.487% $97.33 $20,203
 Oct. 66.00 15.30 $1,010 0.487% $98.29 $21,311
 Nov. 66.00 0.00 $0 0.487% $103.68 $21,414
 Dec. 66.00 4.90 $323 0.487% $104.18 $21,842
 _____ ______ ______
 51.00 $3,341 5.838%
1976 Jan. 66.00 0.80 $53 0.416% $90.81 $21,986
 Feb. 66.00 0.00 $0 0.416% $91.41 $22,077
 March 66.00 3.10 $205 0.416% $91.79 $22,373

*965
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Apr. 66.00 0.00 $0 0.416% $93.02 $22,466
 May 66.00 0.00 $0 0.416% $93.40 $22,560
 June 66.00 0.00 $0 0.416% $93.79 $22,654
 July 70.00 0.00 $0 0.416% $94.18 $22,748
 Aug. 70.00 3.00 $210 0.416% $94.57 $23,052
 Sept. 70.00 0.60 $42 0.416% $95.84 $23,190
 Oct. 70.00 0.00 $0 0.416% $96.41 $23,287
 Nov. 70.00 0.00 $0 0.416% $96.81 $23,383
 Dec. 70.00 1.20 $84 0.416% $97.22 $23,565
 _____ ______ ______
 8.70 $593 4.989%
1977 Jan. 70.00 0.00 $0 0.439% $103.39 $23,668
 Feb. 70.00 0.00 $0 0.439% $103.84 $23,772
 March 70.00 0.00 $0 0.439% $104.30 $23,876
 Apr. 70.00 2.10 $147 0.439% $104.76 $24,128
 May 70.00 1.60 $112 0.439% $105.86 $24,346
 June 70.00 3.00 $210 0.439% $106.82 $24,663
 July 70.00 0.00 $0 0.439% $108.21 $24,771
 Aug. 70.00 0.60 $42 0.439% $108.68 $24,922
 Sept. 70.00 4.70 $329 0.439% $109.34 $25,360
 Oct. 70.00 0.00 $0 0.439% $111.27 $25,471
 Nov. 70.00 8.80 $616 0.439% $111.75 $26,199
 Dec. 70.00 1.90 $133 0.439% $114.95 $26,447
 _____ ______ ______
 22.70 $1,589 5.265%
1978 Jan. 70.00 11.60 $812 0.602% $159.14 $27,418
 Feb. 70.00 6.20 $434 0.602% $164.99 $28,017
 March 70.00 0.00 $0 0.602% $168.59 $28,186
 Apr. 70.00 2.70 $189 0.602% $169.61 $28,544
 May 70.00 0.00 $0 0.602% $171.76 $28,716
 June 70.00 0.00 $0 0.602% $172.80 $28,889
 July 70.00 0.00 $0 0.602% $173.84 $29,063
 Aug. 70.00 0.00 $0 0.602% $174.88 $29,237
 Sept. 70.00 0.00 $0 0.602% $175.94 $29,413
 Oct. 70.00 0.00 $0 0.602% $176.99 $29,590
 Nov. 70.00 0.00 $0 0.602% $178.06 $29,768
 Dec. 70.00 0.00 $0 0.602% $179.13 $29,948
 _____ ______ ______
 20.50 $1,435 7.221%
1979 Jan. 88.00 0.00 $0 0.837% $250.59 $30,198
 Feb. 88.00 0.00 $0 0.837% $252.68 $30,451
 March 88.00 3.60 $317 0.837% $254.80 $31,022
 Apr. 88.00 0.00 $0 0.837% $259.58 $31,282
 May 88.00 0.00 $0 0.837% $261.75 $31,544
 June 88.00 0.00 $0 0.837% $263.94 $31,808
 July 84.00 1.60 $134 0.837% $266.15 $32,208
 Aug. 94.00 2.90 $273 0.837% $269.50 $32,750
 Sept. 94.00 2.80 $263 0.837% $274.04 $33,288
 Oct. 94.00 29.10 $2,735 0.837% $278.53 $36,302
 Nov. 94.00 5.60 $526 0.837% $303.75 $37,132
 Dec. 94.00 0.00 $0 0.837% $310.70 $37,442
 _____ ______ ______
 45.60 $4,249 10.041%

*966
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
1980 Jan. 100.00 15.80 $1,580 0.959% $359.01 $39,381
 Feb. 100.00 18.30 $1,830 0.959% $377.60 $41,589
 March 100.00 15.20 $1,520 0.959% $398.77 $43,508
 Apr. 100.00 20.40 $2,040 0.959% $417.17 $45,965
 May 100.00 9.30 $930 0.959% $440.73 $47,336
 June 100.00 11.10 $1,110 0.959% $453.87 $48,900
 July 100.00 10.40 $1,040 0.959% $468.86 $50,408
 Aug. 100.00 3.90 $390 0.959% $483.33 $51,282
 Sept. 100.00 27.50 $2,750 0.959% $491.71 $54,523
 Oct. 100.00 16.30 $1,630 0.959% $522.79 $56,676
 Nov. 100.00 20.00 $2,000 0.959% $543.43 $59,220
 Dec. 100.00 5.30 $530 0.959% $567.82 $60,317
 _____ ______ ______
 173.50 $17,350 11.506%
1981 Jan. 113.00 20.10 $2,271 1.169% $705.16 $63,294
 Feb. 113.00 0.00 $0 1.169% $739.96 $64,034
 March 113.00 12.90 $1,458 1.169% $748.61 $66,240
 Apr. 113.00 7.60 $859 1.169% $774.40 $67,873
 May 113.00 2.30 $260 1.169% $793.50 $68,927
 June 113.00 5.80 $655 1.169% $805.81 $70,388
 July 113.00 4.80 $542 1.169% $822.89 $71,753
 Aug. 113.00 5.00 $565 1.169% $838.86 $73,157
 Sept. 113.00 11.30 $1,277 1.169% $855.27 $75,289
 Oct. 113.00 10.80 $1,220 1.169% $880.19 $77,390
 Nov. 113.00 2.40 $271 1.169% $904.75 $78,566
 Dec. 113.00 1.40 $158 1.169% $918.50 $79,643
 _____ ______ ______
 84.40 $9,537 14.029%
1982 Jan. 126.00 11.40 $1,436 0.891% $709.22 $81,788
 Feb. 126.00 3.10 $391 0.891% $720.32 $82,907
 March 126.00 2.00 $252 0.891% $730.29 $83,897
 Apr. 126.00 0.00 $0 0.891% $747.11 $84,644
 May 126.00 6.60 $832 0.891% $753.76 $86,230
 June 126.00 44.50 $5,607 0.891% $767.88 $92,605
 July 126.00 10.40 $1,310 0.891% $824.65 $94,740
 Aug. 126.00 5.60 $706 0.891% $843.66 $96,289
 Sept. 126.00 0.00 $101 0.891% $857.45 $97,247
 Oct. 126.00 0.00 $0 0.891% $865.99 $98,113
 Nov. 126.00 7.40 $932 0.891% $873.70 $99,919
 Dec. 126.00 4.50 $567 0.891% $889.78 $101,376
 _____ ______ ______
 96.30 $12,134 10.686%
1983 Jan. 134.00 12.50 $1,675 0.719% $729.06 $103,780
 Feb. 134.00 8.90 $1,193 0.719% $746.35 $105,719
 March 138.00 1.10 $152 0.719% $760.30 $106,631
 Apr. 138.00 7.10 $980 0.719% $766.86 $108,378
 May 138.00 66.60 $9,191 0.719% $779.42 $118,348
 June 138.00 30.10 $4,154 0.719% $851.12 $123,353
 July 138.00 13.20 $1,822 0.719% $887.11 $126,062

*967
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Aug. 138.00 16.80 $2,318 0.719% $906.59 $129,287
 Sept. 138.00 9.50 $1,311 0.719% $929.79 $131,528
 Oct. 138.00 16.10 $2,222 0.719% $945.90 $134,695
 Nov. 138.00 9.80 $1,352 0.719% $968.68 $137,016
 Dec. 138.00 5.80 $800 0.719% $985.38 $138,802
 ______ ______ ______
 197.50 $27,169 8.630%
1984 Jan. 148.00 6.60 $977 0.798% $1,108.10 $140,887
 Feb. 148.00 0.00 $0 0.798% $1,124.75 $142,012
 March 148.00 5.10 $755 0.798% $1,133.73 $143,900
 Apr. 148.00 36.10 $5,343 0.798% $1,148.80 $150,392
 May 148.00 52.40 $7,755 0.798% $1,200.63 $159,348
 June 148.00 3.30 $488 0.798% $1,272.13 $161,108
 July 148.00 0.00 $0 0.798% $1,286.10 $162,394
 Aug. 148.00 0.90 $133 0.798% $1,296.45 $163,824
 Sept. 148.00 8.20 $1,214 0.798% $1,307.86 $166,346
 Oct. 148.00 8.20 $1,214 0.798% $1,327.99 $168,887
 Nov. 148.00 0.00 $0 0.798% $1,348.28 $170,235
 Dec. 148.00 0.00 $0 0.798% $1,359.05 $171,594
 ______ ______ ______
 120.80 $17,878 9.580%
1985 Jan. 160.00 0.00 $0 0.623% $1,069.61 $172,664
 Feb. 160.00 0.00 $0 0.623% $1,076.27 $173,740
 March 160.00 0.00 $0 0.623% $1,082.98 $174,823
 Apr. 160.00 0.00 $0 0.623% $1,089.73 $175,913
 May 160.00 0.00 $0 0.623% $1,096.52 $177,010
 June 160.00 0.00 $0 0.623% $1,103.36 $178,113
 July 160.00 0.00 $0 0.623% $1,110.24 $179,223
 Aug. 160.00 0.00 $0 0.623% $1,117.16 $180,340
 Sept. 160.00 0.00 $0 0.623% $1,124.12 $181,464
 Oct. 160.00 0.00 $0 0.623% $1,131.13 $182,596
 Nov. 160.00 0.00 $0 0.623% $1,138.18 $183,734
 Dec. 160.00 0.00 $0 0.623% $1,145.27 $184,879
 _____ ______ ______
 0.00 $0 7.480%
1986 Jan. 0.00 $0 0.498% $921.31 $185,800
 Feb. 0.00 $0 0.498% $925.91 $186,726
 March 0.00 $0 0.498% $930.52 $187,657
 Apr. 0.00 $0 0.498% $935.16 $188,592
 May 0.00 $0 0.498% $939.82 $189,532
 June 0.00 $0 0.498% $944.50 $190,476
 July 0.00 $0 0.498% $949.21 $191,425
 Aug. 0.00 $0 0.498% $953.94 $192,379
 Sept. 0.00 $0 0.498% $958.69 $193,338
 Oct. 0.00 $0 0.498% $963.47 $194,302
 Nov. 0.00 $0 0.498% $968.27 $195,270
 Dec. 0.00 $0 0.498% $973.09 $196,243
1987 Jan. 0.00 $0 0.485% $951.78 $197,195

*968
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Feb. 0.00 $0 0.485% $956.39 $198,151
 March 0.00 $0 0.485% $961.03 $199,112
 Apr. 0.00 $0 0.485% $965.69 $200,078
 May 0.00 $0 0.485% $970.38 $201,048
 June 0.00 $0 0.485% $975.08 $202,023
 July 0.00 $0 0.485% $979.81 $203,003
 Aug. 0.00 $0 0.485% $984.56 $203,988
 Sept. 0.00 $0 0.485% $989.34 $204,977
 ____ ________ ______
 0.00 $0 5.820%
 1199.00 $109,540 $204,977
 ======= ======== ========

*969 APPENDIX E

 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
ATTORNEY:PLOTKIN
 (A) (B) (C) (D) (E) (F) (G) (H)
 Three Previous Month's
 [(C) × (D)] Month Accumulated Value Accumulated
 Billing Monthly Contemporaneous T-Bill × Current Month's Present
Year Month Rate Hours Payment Amount Rate T-Bill Rate Value
_____________________________________________________________________________________________________
1969 Aug. 0.556%
 Sept. 50.00 2.40 $120 0.556% $0.00 $120
 Oct. 50.00 0.00 $0 0.556% $0.67 $121
 Nov. 50.00 0.00 $0 0.556% $0.67 $121
 Dec. 50.00 19.40 $970 0.556% $0.68 $1,092
 ______ ______ ______
 21.80 $1,090 6.677%
1970 Jan. 50.00 24.10 $1,205 0.538% $5.88 $2,303
 Feb. 50.00 40.00 $2,000 0.538% $12.39 $4,315
 March 50.00 0.00 $0 0.538% $23.22 $4,339
 Apr. 50.00 0.00 $0 0.538% $23.35 $4,362
 May 50.00 1.20 $60 0.538% $23.47 $4,445
 June 50.00 1.40 $70 0.538% $23.92 $4,539
 July 50.00 6.20 $310 0.538% $24.43 $4,874
 Aug. 50.00 2.30 $115 0.538% $26.23 $5,015
 Sept. 50.00 3.20 $160 0.538% $26.99 $5,202
 Oct. 50.00 0.00 $0 0.538% $27.99 $5,230
 Nov. 50.00 23.00 $1,150 0.538% $28.15 $6,408
 Dec. 55.00 20.10 $1,106 0.538% $34.49 $7,548
 ______ ______ ______
 121.50 $6,176 6.458%
1971 Jan. 55.00 9.70 $534 0.362% $27.35 $8,109
 Feb. 55.00 0.00 $0 0.362% $29.38 $8,138
 March 55.00 0.00 $0 0.362% $29.49 $8,168
 Apr. 55.00 0.00 $0 0.362% $29.59 $8,197
 May 55.00 0.00 $0 0.362% $29.70 $8,227
 June 60.00 0.00 $0 0.362% $29.81 $8,257
 July 60.00 0.00 $0 0.362% $29.92 $8,287
 Aug. 60.00 0.00 $0 0.362% $30.03 $8,317
 Sept. 60.00 0.00 $0 0.362% $30.13 $8,347
 Oct. 60.00 0.00 $0 0.362% $30.24 $8,377
 Nov. 60.00 10.00 $600 0.362% $30.35 $9,008
 Dec. 60.00 5.20 $312 0.362% $32.64 $9,352
 ______ ______ ______
 24.90 $1,446 4.348%
1972 Jan. 60.00 0.00 $0 0.339% $31.73 $9,384
 Feb. 60.00 43.20 $2,592 0.339% $31.83 $12,008
 March 60.00 7.10 $426 0.339% $40.74 $12,474
 Apr. 60.00 28.70 $1,722 0.339% $42.32 $14,239
 May 60.00 25.50 $1,530 0.339% $48.31 $15,817
 June 60.00 12.30 $738 0.339% $53.66 $16,609
 July 60.00 7.70 $462 0.339% $56.35 $17,127
 Aug. 60.00 7.20 $432 0.339% $58.10 $17,617
 Sept. 60.00 9.70 $582 0.339% $59.77 $18,259

*970
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Oct. 60.00 22.60 $1,356 0.339% $61.94 $19,677
 Nov. 60.00 9.60 $576 0.339% $66.75 $20,320
 Dec. 60.00 0.00 $0 0.339% $68.93 $20,389
 ______ ______ _______
 173.60 $10,416 4.071%
1973 Jan. 60.00 1.20 $72 0.587% $119.63 $20,580
 Feb. 60.00 8.80 $528 0.587% $120.75 $21,229
 March 60.00 0.00 $0 0.587% $124.56 $21,354
 Apr. 60.00 0.00 $0 0.587% $125.29 $21,479
 May 60.00 0.00 $0 0.587% $126.03 $21,605
 June 60.00 6.58 $395 0.587% $126.77 $22,126
 July 60.00 6.58 $395 0.587% $129.83 $22,651
 Aug. 60.00 6.58 $395 0.587% $132.91 $23,179
 Sept. 60.00 6.58 $395 0.587% $136.00 $23,710
 Oct. 60.00 6.58 $395 0.587% $139.12 $24,243
 Nov. 60.00 6.58 $395 0.587% $142.25 $24,781
 Dec. 60.00 6.58 $395 0.587% $145.40 $25,321
 ______ ______ _______
 56.06 $3,364 7.041%
1974 Jan. 65.00 6.58 $428 0.657% $166.40 $25,915
 Feb. 65.00 6.58 $428 0.657% $170.30 $26,513
 March 65.00 6.58 $428 0.657% $174.23 $27,115
 Apr. 65.00 6.58 $428 0.657% $178.19 $27,721
 May 65.00 6.58 $428 0.657% $182.17 $28,331
 June 65.00 6.58 $428 0.657% $186.18 $28,944
 July 65.00 6.58 $428 0.657% $190.21 $29,562
 Aug. 65.00 6.58 $428 0.657% $194.27 $30,184
 Sept. 65.00 6.58 $428 0.657% $198.36 $30,810
 Oct. 65.00 6.58 $428 0.657% $202.48 $31,441
 Nov. 65.00 6.58 $428 0.657% $206.62 $32,075
 Dec. 65.00 6.58 $428 0.657% $210.79 $32,713
 ______ ______ ______
 78.96 $5,132 7.886%
1975 Jan. 70.00 44.00 $3,080 0.487% $159.15 $35,952
 Feb. 70.00 1.10 $77 0.487% $174.91 $36,204
 March 70.00 0.00 $0 0.487% $176.13 $36,381
 Apr. 70.00 0.00 $0 0.487% $176.99 $36,558
 May 70.00 0.00 $0 0.487% $177.85 $36,735
 June 70.00 0.00 $0 0.487% $178.72 $36,914
 July 70.00 0.00 $0 0.487% $179.59 $37,094
 Aug. 70.00 0.00 $0 0.487% $180.46 $37,274
 Sept. 70.00 0.00 $0 0.487% $181.34 $37,455
 Oct. 70.00 0.00 $0 0.487% $182.22 $37,638
 Nov. 70.00 0.00 $0 0.487% $183.11 $37,821
 Dec. 70.00 0.00 $0 0.487% $184.00 $38,005
 ______ ______ ______
 45.10 $3,157 5.838%
1976 Jan. 75.00 0.00 $0 0.416% $158.00 $38,163
 Feb. 75.00 0.00 $0 0.416% $158.66 $38,321
 March 75.00 0.00 $0 0.416% $159.32 $38,481

*971
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Apr. 75.00 0.00 $0 0.416% $159.98 $38,641
 May 75.00 0.00 $0 0.416% $160.65 $38,801
 June 75.00 0.00 $0 0.416% $161.32 $38,963
 July 75.00 0.00 $0 0.416% $161.99 $39,125
 Aug. 75.00 0.00 $0 0.416% $162.66 $39,287
 Sept. 75.00 0.00 $0 0.416% $163.34 $39,451
 Oct. 75.00 0.00 $0 0.416% $164.02 $39,615
 Nov. 75.00 0.00 $0 0.416% $164.70 $39,779
 Dec. 75.00 0.00 $0 0.416% $165.38 $39,945
 ______ ______ ______
 0.00 $0 4.989%
1977 Jan. 85.00 0.00 $0 0.439% $175.26 $40,120
 Feb. 85.00 0.00 $0 0.439% $176.03 $40,296
 March 85.00 0.00 $0 0.439% $176.80 $40,473
 Apr. 85.00 0.00 $0 0.439% $177.57 $40,650
 May 85.00 0.00 $0 0.439% $178.35 $40,829
 June 85.00 0.00 $0 0.439% $179.14 $41,008
 July 85.00 0.00 $0 0.439% $179.92 $41,188
 Aug. 85.00 0.00 $0 0.439% $180.71 $41,369
 Sept. 85.00 0.00 $0 0.439% $181.50 $41,550
 Oct. 85.00 0.00 $0 0.439% $182.30 $41,732
 Nov. 85.00 0.00 $0 0.439% $183.10 $41,915
 Dec. 85.00 0.00 $0 0.439% $183.90 $42,099
 ______ ______ ______
 0.00 $0 5.265%
1978 Jan. 85.00 0.00 $0 0.602% $253.33 $42,353
 Feb. 85.00 0.00 $0 0.602% $254.86 $42,608
 March 85.00 0.00 $0 0.602% $256.39 $42,864
 Apr. 85.00 0.00 $0 0.602% $257.93 $43,122
 May 85.00 0.00 $0 0.602% $259.49 $43,381
 June 85.00 0.00 $0 0.602% $261.05 $43,642
 July 85.00 0.00 $0 0.602% $262.62 $43,905
 Aug. 85.00 0.00 $0 0.602% $264.20 $44,169
 Sept. 85.00 0.00 $0 0.602% $265.79 $44,435
 Oct. 85.00 0.00 $0 0.602% $267.39 $44,702
 Nov. 100.00 0.00 $0 0.602% $269.00 $44,971
 Dec. 100.00 0.00 $0 0.602% $270.62 $45,242
 ______ ______ ______
 0.00 $0 7.221%
1979 Jan. 100.00 0.00 $0 0.837% $378.56 $45,621
 Feb. 100.00 0.00 $0 0.837% $381.73 $46,002
 March 100.00 0.00 $0 0.837% $384.92 $46,387
 Apr. 100.00 0.00 $0 0.837% $388.15 $46,775
 May 100.00 0.00 $0 0.837% $391.39 $47,167
 June 100.00 0.00 $0 0.837% $394.67 $47,561
 July 100.00 0.00 $0 0.837% $397.97 $47,959
 Aug. 100.00 0.00 $0 0.837% $401.30 $48,361
 Sept. 125.00 0.00 $0 0.837% $404.66 $48,765
 Oct. 125.00 0.00 $0 0.837% $408.04 $49,173
 Nov. 125.00 0.00 $0 0.837% $411.46 $49,585
 Dec. 125.00 0.00 $0 0.837% $414.90 $50,000
 ______ ______ ______
 0.00 $0 10.041%

*972
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
1980 Jan. 125.00 0.00 $0 0.959% $479.41 $50,479
 Feb. 125.00 0.00 $0 0.959% $484.01 $50,963
 March 125.00 0.00 $0 0.959% $488.65 $51,452
 Apr. 125.00 0.00 $0 0.959% $493.34 $51,945
 May 125.00 0.00 $0 0.959% $498.07 $52,443
 June 125.00 0.00 $0 0.959% $502.84 $52,946
 July 125.00 0.00 $0 0.959% $507.67 $53,454
 Aug. 125.00 0.00 $0 0.959% $512.53 $53,966
 Sept. 135.00 0.00 $0 0.959% $517.45 $54,484
 Oct. 135.00 0.00 $0 0.959% $522.41 $55,006
 Nov. 135.00 0.00 $0 0.959% $527.42 $55,534
 Dec. 135.00 0.00 $0 0.959% $532.47 $56,066
 ______ ______ ______
 0.00 $0 11.506%
1981 Jan. 135.00 0.00 $0 1.169% $655.46 $56,722
 Feb. 135.00 0.00 $0 1.169% $663.12 $57,385
 March 135.00 0.00 $0 1.169% $670.87 $58,056
 Apr. 135.00 0.00 $0 1.169% $678.72 $58,734
 May 135.00 0.00 $0 1.169% $686.65 $59,421
 June 135.00 0.00 $0 1.169% $694.68 $60,116
 July 135.00 0.00 $0 1.169% $702.00 $60,818
 Aug. 135.00 0.00 $0 1.169% $711.02 $61,529
 Sept. 135.00 0.00 $0 1.169% $719.33 $62,249
 Oct. 135.00 0.00 $0 1.169% $727.74 $62,976
 Nov. 135.00 0.00 $0 1.169% $736.25 $63,713
 Dec. 135.00 0.00 $0 1.169% $744.85 $64,458
 ______ ______ ______
 0.00 $0 14.029%
1982 Jan. 150.00 0.00 $0 0.891% $573.99 $65,032
 Feb. 150.00 0.00 $0 0.891% $579.11 $65,611
 March 150.00 0.00 $0 0.891% $584.26 $66,195
 Apr. 150.00 0.00 $0 0.891% $589.47 $66,784
 May 150.00 1.30 $195 0.891% $594.72 $67,574
 June 150.00 88.70 $13,305 0.891% $601.75 $81,481
 July 150.00 21.10 $3,165 0.891% $725.59 $85,371
 Aug. 150.00 33.20 $4,980 0.891% $760.23 $91,112
 Sept. 150.00 0.00 $0 0.891% $811.35 $91,923
 Oct. 150.00 0.00 $0 0.891% $818.57 $92,742
 Nov. 150.00 0.00 $0 0.891% $825.86 $93,567
 Dec. 150.00 27.40 $4,110 0.891% $833.22 $98,511
 ______ ______ ______
 171.70 $25,755 10.686%
1983 Jan. 150.00 0.00 $0 0.719% $708.46 $99,219
 Feb. 150.00 0.00 $0 0.719% $713.55 $99,933
 March 150.00 0.70 $105 0.719% $718.68 $100,756
 Apr. 165.00 18.10 $2,987 0.719% $724.61 $104,468
 May 165.00 17.50 $2,888 0.719% $751.30 $108,106
 June 165.00 3.50 $578 0.719% $777.46 $109,461
 July 165.00 0.00 $0 0.719% $787.21 $110,248

*973
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Aug. 165.00 0.00 $0 0.719% $792.87 $111,041
 Sept. 165.00 0.00 $0 0.719% $798.57 $111,840
 Oct. 165.00 0.00 $0 0.719% $804.32 $112,644
 Nov. 165.00 0.00 $0 0.719% $810.10 $113,454
 Dec. 165.00 0.00 $0 0.719% $815.93 $114,270
 ______ ______ ______
 39.80 $6,557 8.630%
1984 Jan. 180.00 0.00 $0 0.798% $912.26 $115,183
 Feb. 180.00 0.00 $0 0.798% $919.54 $116,102
 March 180.00 0.00 $0 0.798% $926.88 $117,029
 Apr. 180.00 0.00 $0 0.798% $934.28 $117,963
 May 180.00 0.00 $0 0.798% $941.74 $118,905
 June 180.00 0.00 $0 0.798% $949.26 $119,854
 July 180.00 0.00 $0 0.798% $956.84 $120,811
 Aug. 180.00 0.00 $0 0.798% $964.47 $121,776
 Sept. 180.00 0.00 $0 0.798% $972.17 $122,748
 Oct. 180.00 0.00 $0 0.798% $979.94 $123,728
 Nov. 180.00 0.00 $0 0.798% $987.76 $124,715
 Dec. 180.00 0.00 $0 0.798% $995.64 $125,711
 ______ ______ ______
 0.00 $0 9.580%
1985 Jan. 185.00 0.00 $0 0.623% $783.60 $126,495
 Feb. 185.00 0.00 $0 0.623% $788.48 $127,283
 March 185.00 0.00 $0 0.623% $793.40 $128,077
 Apr. 185.00 0.00 $0 0.623% $798.34 $128,875
 May 185.00 0.00 $0 0.623% $803.32 $129,678
 June 185.00 0.00 $0 0.623% $808.33 $130,487
 July 185.00 0.00 $0 0.623% $813.37 $131,300
 Aug. 185.00 0.00 $0 0.623% $818.44 $132,118
 Sept. 185.00 0.00 $0 0.623% $823.54 $132,942
 Oct. 185.00 0.00 $0 0.623% $828.67 $133,771
 Nov. 185.00 0.00 $0 0.623% $833.84 $134,604
 Dec. 185.00 0.00 $0 0.623% $839.03 $135,443
 ______ ______ ______
 0.00 $0 7.480%
1986 Jan. 0.00 $0 0.498% $674.96 $136,118
 Feb. 0.00 $0 0.498% $678.32 $136,797
 March 0.00 $0 0.498% $681.70 $137,478
 Apr. 0.00 $0 0.498% $685.10 $138,163
 May 0.00 $0 0.498% $680.51 $138,852
 June 0.00 $0 0.498% $691.95 $139,544
 July 0.00 $0 0.498% $695.39 $140,239
 Aug. 0.00 $0 0.498% $698.86 $140,938
 Sept. 0.00 $0 0.498% $702.34 $141,641
 Oct. 0.00 $0 0.498% $705.84 $142,346
 Nov. 0.00 $0 0.498% $709.36 $143,056
 Dec. 0.00 $0 0.498% $712.89 $143,769
 ______ ______ ______
 0.00 $0 5.980%
1987 Jan. 0.00 $0 0.485% $697.28 $144,466

*974
 ACCUMULATED PRESENT VALUE OF FEES IN SHAKMAN LITIGATION AS OF 30 NOVEMBER 1987
 Feb. 0.00 $0 0.485% $700.66 $145,167
 March 0.00 $0 0.485% $704.06 $145,871
 Apr. 0.00 $0 0.485% $707.47 $146,578
 May 0.00 $0 0.485% $710.90 $147,289
 June 0.00 $0 0.485% $714.35 $148,003
 July 0.00 $0 0.485% $717.82 $148,721
 Aug. 0.00 $0 0.485% $721.30 $149,442
 Sept. 0.00 $0 0.485% $724.80 $150,167
 Oct. 0.00 $0 0.485% $728.31 $150,896
 Nov. 0.00 $0 0.485% $731.84 $151,627
 ______ ______ ______
 0.00 $0 5.820%
 733.40 $63,090 $151,627
 ====== ======= ========
* Represents average 3 month T-Bill rate for entire year.

NOTES
[1] The defendants electing to appeal this court's entry of summary judgment in 1979 include: George Dunne, President of the Board of Commissioners of Cook County; Stanley Kusper, Jr., the Cook County Clerk; Thomas C. Hynes, Assessor of Cook County; the Forest Preserve District of Cook County; the Democratic Party County Central Committee for Cook County and its members; and Edward R. Vrdolyak.
[2] Plaintiffs only seek fee enhancements for four of their attorneys: Mr. Shakman, Mr. Johnson, Mr. Plotkin, and Mr. Fross. Of the $883,504.75 in fees awarded for all attorneys in Shakman IV, $847,403 is attributable to the hours expended by these four attorneys. Thus, any adjustments to the lodestar resulting from this order will be based on the $847,403 figure and not the total base award of $883,504.75.
[3] Defendants also contend that for equitable reasons, no multiplier should be awarded to certain of plaintiffs' counsel because they are members of law firms which were subsequently joined by some of the named individual defendants. Defendants assert that if a multiplier was awarded, former defendants would improperly receive a portion of that enhancement as plaintiffs' counsel's law partners. However, this contention was expressly rejected when this court denied defendants' motion to compell documents relating to plaintiffs' counsel's partnership agreements. See Shakman v. Democratic Org. of Cook County, No. 69 C 2145, slip op. at 1 (N.D.Ill. Oct. 10, 1985). Moreover, this court has already determined in Shakman IV that defendants had not presented any extraordinary circumstances which precluded an award of reasonable attorneys' fees. Shakman IV, 634 F.Supp. at 899. Defendants are misguided in their assumption that an award of a multiplier results in some type of bonus that is unrelated to fees actually earned by plaintiffs' counsel and that inequity would occur if former defendants were to receive part of this bonus. No logical basis exists for distinguishing between fee awards which include an adjustment to the lodestar and those which do not because multipliers are awarded only when the lodestar fails to produce a reasonable attorney's fee. Finally, because the counsel at whom defendants' objection is directed have since associated themselves with new law firms, defendants' argument is moot.
[4] The twelve factors mentioned by the Johnson court include: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
[5] Only portions of the plurality's opinion with which Justice O'Connor concurred are referred to as the majority's or Court's opinion.
[6] The majority made clear that adjustments for risk of loss or nonpayment could never be based on the fact that the case involves "an issue of public importance, that the plaintiff's position is unpopular in the community, or that the defendant is difficult and obstreperous." The Court also noted that an enhancement for risk of loss could never be justified on the ground that a possibility exists that some of the time claimed by plaintiff's counsel would be deemed unnecessary by the district court and excluded from the lodestar. Id. at ___, 107 S.Ct. at 3085.
[7] The Seventh Circuit recognizes that delay in the consideration of payment involves two factors: inflation and the time value of money. See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 776 F.2d 646, 651 n. 3, 660, 662-64 (1985). Defendants' arguments concerning a proper adjustment for delay fail to recognize the later factor. Although this court has the discretion to adjust for delay solely on the basis of inflation, it is empowered to also consider the time value of money in arriving at an appropriate adjustment. As the Seventh Circuit has noted on several occasions, a district court may compensate for delay by "a computation of interest [or] a percentage allowance for inflation...." Ohio-Sealy Mattress, 776 F.2d at 663; Chrapliwy v. Uniroyal, Inc., 670 F.2d 760, 764 n. 6 (7th Cir. 1982). Given the substantial period of delay experienced in this case, simply adjusting the lodestar for inflation will not produce a fee sufficient to induce competent attorneys to accept cases of a similar nature in the future. As such, the adjustment for delay in payment in this case will be based on inflation and the time value of money.
[8] Defendants' contention that plaintiffs' failure to submit a petition for interim fees in 1976 (upon enactment of Section 1988) forecloses any adjustment for delay is unpersuasive and without support in the case law. Moreover, such an argument makes little economic sense. A similar argument was considered and rejected by the Seventh Circuit in Gautreaux v. Chicago Housing Authority, 690 F.2d 601, 612-13 (7th Cir.1982), cert. denied, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). Finding the reasoning in Gautreaux applicable to the present case, this court is unable to accept defendants' arguments on this point.
[9] Contrary to defendants' assertions, authority exists for using current hourly rates plus a multiplier to adjust for delay in payment. See Environmental Defense Fund, Inc. v. Environmental Protection Agency, 672 F.2d 42, 60 (D.C.Cir. 1982).
[10] The mechanics of the present value computations found in Appendices B-E are as follows: Column A and B set forth the year and month in which the work in question was completed. Column C contains the actual billing rate for the attorney in question for the month and year the work was actually done. In Column D the total number of hours which the attorney in question worked during each month of each year is recorded. The contemporaneous payment amount stated in Column E is computed by multiplying the applicable billing rate (Column C) by the total number of monthly hours (Column D). Column F represents the annual average interest rate for three-month Treasury bills in terms of a monthly multiplier. Rates for 1969-1980 are taken from the Survey of Current Business and Business Statistics, the biennial supplement to the Survey of Current Business, both of which are published by the United States Department of Commerce. Data for 1981-1987 are taken from Economic Indicators, a publication prepared by the Council of Economic Advisors for the Joint Economic Committee, and the Wall Street Journal. Column G contains the monthly adjustment for inflation and the time value of money. This amount is ascertained by multiplying the previous month's accumulated value by the applicable Treasury bill rate (Column F). Column H represents the accumulated present value which is derived by adding (1) the monthly contemporaneous payment amount (Column E) with (2) the previous month's accumulated present value (Column H), and (3) the present month's adjustment for inflation and the time value of money (Column G).
[11] Since plaintiffs' present fee petition does not include any time expended on the appeal resulting in the reversal of Shakman II, application of a success multiplier does not reward plaintiffs' counsel for work on aspects of this case in which plaintiffs did not prevail. With certain conditions, Shakman IV imposed joint and several liability on defendants to pay plaintiffs' legal fees. Shakman IV, 634 F.Supp. at 904. Thus, the fact certain defendants will not be obligated to pay a portion of those fees because of their success in appealing Shakman II does not affect plaintiffs' entitlement to the fees requested in their petition. However, the fact that plaintiffs did not prevail in Shakman III is a consideration which this court weighs in determining the propriety of plaintiffs' request for a success enhancement.
[12] This court expresses its appreciation to Larry D. Appelson and Ted C. Newman, administrative analysts employed with the Office of the Clerk of Court, for preparing the statistical analyses contained in Appendices A-E.
[*] This figure is the sum of fees due attorneys other than those listed above. See supra note 2.
[#] Represents average 3 month T-Bill rate for entire year.
[#] Represents average 3 month T-Bill rate for entire year.